NEILL GRADING & CONSTRUCTION COMPANY, INC., Plaintiff v. DAVID B. LINGAFELT and NEWTON CONOVER COMMUNICATIONS, INC., Defendants

No. COA04-108

(Filed 18 January 2005)

**Appeal and Error; Libel and Slander— appealability—interlocutory order—denial of summary judgment—public concern—private individual**

Defendants' appeal from the trial court's denial of their motion for summary judgment and motion for partial summary judgment is dismissed as an appeal from an interlocutory order in a libel action where the particular facts evoke the question of whether defendants defamed plaintiff construction company when issuing a statement injurious to plaintiff's reputation on a matter of public concern regarding sinkholes in a parking lot

resulting from a downpour, because no substantial right was affected where: (1) although determining the cause of the sinkholes was a matter of public concern, North Carolina's standard of fault for speech regarding a matter of public concern is negligence when plaintiff is a private individual; (2) the trial court was correct in leaving for the jury the factual question of whether defendants were negligent in their investigation of who did the site work at the pertinent parking lot before issuing the injurious statements; (3) while First Amendment protections supplant a state's common law where the content is a matter of public concern, the dissemination of information regarding a private individual is not of a kind benefitted by the uninhibited, robust, and wide-open speech promoted by the actual malice standard of fault for public officials or public figures; (4) the negligence standard of fault does provide its own cooling and deliberate effect on the kind of speech at issue in this case; and (5) finding a substantial right where it would not further any First Amendment protection would unnecessarily weigh against North Carolina's constitutional mandate that its courts of justice protect the otherwise good names of its private citizens.

Appeal by defendants from judgment entered 17 November 2003 by Judge Robert C. Ervin in Catawba County Superior Court. Heard in the Court of Appeals 19 October 2004.

*Patrick, Harper & Dixon, L.L.P., by Stephen M. Thomas and Michael J. Barnett, for plaintiff appellee.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Mark J. Prak, Mack Sperling and Charles E. Coble, for defendant appellants.*

McCULLOUGH, Judge.

This is an appeal from the trial court's denial of Mr. David Lingafelt's ("Mr. Lingafelt") and Newton Conover Communications, Inc.'s ("NCC") (collectively "defendants") motion for summary judgment and motion for partial summary judgment in a libel action brought by Neill Grading & Construction Company, Inc. ("plaintiff").

The record sets forth the following undisputed facts: Plaintiff is a North Carolina corporation involved in the construction business, particularly in grading and site preparation, with its principal place of business in Catawba County, North Carolina. The company was incor-

porated sometime in the 1960s. Plaintiff is a well-known corporation in the area, and does "quite a lot of site preparation work in and around Catawba County."

Defendant Mr. Lingafelt is president of defendant NCC, a North Carolina Corporation that holds licenses to two radio stations, WIRC and WNNC, operating in Western North Carolina. Mr. Lingafelt and his wife are the sole shareholders of NCC. WNNC is broadcast daily from 5:00 a.m. to midnight. Mr. Lingafelt is general manager of WNNC; he acts as the station engineer, manager, and on-the-air morning personality. His on-the-air hours are typically Monday through Friday, from 5:00 a.m. to 9:00 a.m.

Buffalo's Restaurant ("Buffalo's") is located on Highway 70 in Hickory. Approximately 30 years ago a drainage pipe was laid beside a creek bed on the property where Buffalo's now sits. The area around the pipe filled in with sediment over the years. Before the property was sold to the current owners, a prior owner solicited a bid from plaintiff to remove and replace the pipe. Plaintiff's bid was approximately $300,000 to $400,000 to remove all the earth to gain access to the original pipe and replace it. The work was never contracted for.

On the afternoon of Saturday, 17 August 2002, approximately four to six inches of rain fell in Hickory in a period of some 90 minutes. Over the area of the underlying drainage pipe, two large sinkholes ("the sinkholes") in Buffalo's parking lot resulted from the downpour. The sinkholes were subject to rather substantial media coverage.

Mr. Lingafelt believed, and plaintiff asserted by way of deposition, "that there was a high probability that [plaintiff] would have been involved" in the site preparation where the sinkholes occurred. Mr. Lingafelt testified that he had seen plaintiff's signs on or very near Buffalo's property. He believed he had seen these signs in the late 1990's or early 2000's when a good deal of construction was going up in that area. Thereafter, Mr. Lingafelt asked his production manager Mr. Carl Campbell ("Mr. Campbell"), who also worked for the county as a 911 operator, to look into who did the site preparation at Buffalo's. By way of his deposition, Mr. Campbell testified that such a request was "very, very rare," and that Mr. Campbell "[didn't] know exactly if [Mr. Lingafelt] thought maybe that [Mr.Campbell] was going to go to the permit office and try to find out or something like that." Mr. Campbell asked a trainee at the communications center, known here only as Richie, to identify who did the site preparation work at

Buffalo's. Richie stated directly that it was plaintiff. Mr. Campbell testified that he knew of no basis for Richie's information, and that the trainee no longer works at the communications center. In "passing conversation," Mr. Campbell spoke with Mr. Mike Isenhour (Mr. Isenhour), another trainee at the communications center. Mr. Isenhour, less definitive than Richie, said he "believed" plaintiff had done the work at Buffalo's. Reporting the results of his investigation to Mr. Lingafelt, Mr. Campbell mentioned that he had heard in "casual conversation" from two people that plaintiff had done the site work at Buffalo's.

During "Catawba Valley in the Morning," defendants' 6:00 a.m. morning newscast on 21 August 2002, Mr. Lingafelt made a number of statements concerning the sinkholes and plaintiff. The substance of these statements was submitted to the court by way of affidavit of Ms. Robbie Neill, the mother of plaintiff's owner and president Mr. Edward Neill. She attested:

> I heard Mr. Lingafelt say the following, which if it is not set forth verbatim is very, very close to the actual words he spoke: (1) I have conducted an investigation about who did the site preparation at Buffalo's Restaurant where the well-publicized sink holes appeared last Saturday; (2) that Neill Grading Company did the site preparation there; (3) that Neill Grading does quite a lot of site preparation in and around Catawba County and frequently has to go back to sites to make repairs to satisfy the customer; and (4) that the drain site at Buffalo's Restaurant was a gully and they (Neill Grading) just "covered it over instead of removing it and fixing it right" and then the paved parking lot caved in.

On the same day these statements were made by Mr. Lingafelt, plaintiff demanded that defendants, pursuant to N.C. Gen. Stat. §§ 99-1 and 99-2, broadcast a retraction. Plaintiff asked to be notified of the dates and times when such a retraction was to be broadcast so that it could be monitored. No such notice was given, and defendants contended no tape or record containing the contents of the retraction existed.

During discovery, plaintiff produced a videotape containing the retraction. Defendants stated in interrogatories that the retraction was broadcast twice on 22 August 2002 via WNNC and at approximately the same times as the comments were made the preceding day. The substance of this retraction was as follows:

Now I'm going to say that and they're not always, I said yesterday morning that reportedly, according to our sources, that Neill Grading & Construction Company [plaintiff] had been involved in site preparation there. And they are denying that and I stand corrected. So if indeed they have never done any work in that part of the world, then obviously they are not involved at all in that situation at Buffalo Restaurant's parking lot. Some of the other things that were said were my own investigation, my own experiences, etc., etc., and I certainly stand by those 100%.

So, but anyway, it is true, according, actually they sent out a press release on this—did you get it? I'll give you a copy of it—that said that they had never been involved in any grading or pipe installation work for either the past or present owners at the site of the two large sinkholes in Buffalo's Restaurant's parking lot on Highway 70. That's according to their President, that's it. And anyway, so my sources apparently were incorrect and, as I said, that was reportedly what they have done, passed on to me. So, we won't use those sources anymore I guess.

Defendants and plaintiff had a preexisting relationship before the events of the case at bar. In 1999, Mr. Lingafelt had been bothered by an incident that occurred on his property where plaintiff had inadvertently removed trees from Mr. Lingafelt's property "after some documents had been signed that said that wouldn't happen[.]" This incident started Mr. Lingafelt to question other work that plaintiff was performing for cities, municipalities, and school boards. He found that the people involved were not always satisfied with plaintiff's work. Defendants' newsman, Mr. Al Mainess ("Mr. Mainess"), was alleged to have attended a Hickory School Board meeting where problems with plaintiff's work were discussed. By letter dated 26 July 2001, plaintiff stated the following:

Mr. Al Maness [sic] made disparaging comments concerning the manner in which [plaintiff] conducts its business. Specifically, you suggested that [plaintiff] caused the fire at Cranford Woodcarving, that they 'mess-up' their projects and then cover-up their mistakes, that they perform projects without permits, and that "there is some pretty bad stuff coming out on them."

The letter maintained that these statements were "slander per se." In his deposition, Mr. Mainess claimed he did not remember the circumstances that provoked this letter or that he made any such allegations against plaintiff.

Plaintiff filed its suit against defendants on 12 September 2002 claiming defendants' on-the-air statements of 21 August 2002 constituted "malicious, willful and wanton defamation," and sought actual damages and punitive damages. After discovery, which included depositions taken of Mr. Lingafelt, Mr. Mainess, Mr. Campbell, and Mr. Neill, as well as various interrogatories, defendants filed their motion for summary judgment on 20 October 2003. Defendants claimed there was no genuine issue of material fact that defendants "act[ed] with the requisite malice which Plaintiff must prove by clear and convincing evidence; and furthermore because Plaintiff cannot establish that it suffered any actual damages whatsoever as a result of the allegedly defamatory statements referred to in the Complaint." In the alternative, defendants moved for partial summary judgment on the issue of compensatory and punitive damages, claiming that no factual basis had been alleged upon which compensatory damages could be found, and that punitive damages are barred as a matter of law where defendants complied with N.C. Gen. Stat. § 99-2 (2003). In the trial court's complete denial of defendants' motion, the court made no reference to the degree of fault, actual malice or otherwise, when finding that genuine issues of material fact existed as to the defamation claim, and the actual and punitive damages arising thereunder.

In their appeal, those assignments of error preserved in defendants' brief allege that summary judgment should have been rendered in their favor as a matter of law. They contend no issue of material fact exists to sustain plaintiff's claims of defamation, actual damages, and/or punitive damages.

## Motion to Dismiss this Appeal as Interlocutory

### I. Standard of Review

As a threshold matter, the posture of this case is interlocutory in nature, and plaintiff has moved we dismiss this appeal as being presently unfit for our review.

Generally, a denial of summary judgment, because it does not dispose of the case, "is an interlocutory order from which there is ordinarily no right of appeal." *Liggett Group v. Sunas*, 113 N.C. App. 19, 23, 437 S.E.2d 674, 677 (1993). Notwithstanding this rule, there are two instances in which a party may petition for appellate review of an otherwise interlocutory order. One type of order worthy of judicial review, as defendants allege in the case at bar, is where delaying an

appeal would prejudice a petitioner's "substantial right." *Liggett*, 113 N.C. App. at 23-24, 437 S.E.2d at 677. In North Carolina, a two-part test has developed for the determination of whether a substantial right has been prejudiced: the "right itself must be substantial and the deprivation of that substantial right must potentially work injury . . . if not corrected before appeal from final judgment." *Goldston v. American Motors Corp.*, 326 N.C. 723, 726, 392 S.E.2d 735, 736 (1990). As raised in their answer, defendants contend plaintiff's defamation suit implicates the First Amendment guarantees of the United State's Constitution, falling outside the rubric of North Carolina's general common law of defamation, and therefore affects a substantial right.

II. United States Supreme Court First Amendment/Libel Jurisprudence

Before addressing defendants' substantial right contention, it is necessary to briefly review when potentially *libelous per se* speech, as alleged in this case, is elevated from a state's common law to having at least some guarantees of protection under the First Amendment of the Constitution. Generally, this degree of First Amendment protection is governed by two factors: first, the individual capacity of the plaintiff; and, second, the content of the speech. In a majority opinion by the United States Supreme Court, Justice O'Connor summarized how these two factors interplay:

One can discern . . . two forces that may reshape the common-law landscape to conform to the First Amendment. The first is whether the plaintiff is a public official or figure, or is instead a private figure. The second is whether the speech at issue is of public concern. When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law. When the speech is of public concern but the plaintiff is a private figure . . . the Constitution still supplants the standards of the common law, but the constitutional requirements are, in at least some of their range, less forbidding than when the plaintiff is a public figure and the speech is of public concern. When the speech is of exclusively private concern and the plaintiff is a private figure . . . the constitutional requirements do not necessarily force any change in at least some of the features of the common-law landscape.

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 774, 89 L. Ed. 2d 783, 791-92 (1986). Justice O'Connor's summary was rooted in three seminal Supreme Court opinions. In *New York Times Co. v. Sullivan*, the Court held that where the alleged libelous speech involved a public official, false statements regarding critiques of their official conduct must be shown to have been made with "actual malice." 376 U.S. 254, 279-80, 11 L. Ed. 2d 686, 726 (1964). Later, in *Gertz v. Welch* the Court held that

> so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a *private individual.*

418 U.S. 323, 347, 41 L. Ed. 2d 789, 809 (1974) (emphasis added). Though neither *New York Times* nor *Gertz* specifically addressed the content of the speech at issue, focusing instead on the status of the plaintiffs and the defendants, it was later determined by the Court that at the heart of those decisions was that the content of the speech was "of public concern." *Dun & Bradstreet v. Greenmoss Builders*, 472 U.S. 749, 757-61, 86 L. Ed. 2d 593, 601-04 (1985). The U.S. Supreme Court went on to hold that where the plaintiff is a private figure, and the speech at issue is of private concern, a state court is free to apply its governing common law without implicating First Amendment concerns. *Id.* at 763, 86 L. Ed. 2d at 605; *see also Mutafis v. Erie Ins. Exch.*, 775 F.2d 593, 595 (4th Cir. 1985).

Therefore, after *Dun & Bradstreet*, *Gertz* sets the framework for First Amendment jurisprudence concerning speech that is of "public concern," but is injurious to a "private individual."

III. *Priest v. Sobeck*

In the case at bar, the basis of defendants' argument alleging a substantial right rests in our Supreme Court's decision in *Priest v. Sobeck*, 357 N.C. 159, 579 S.E.2d 250 (2003) (adopting dissent at 153 N.C. App. 662, 670-71, 571 S.E.2d 75, 80-81 (2002) (Greene, J., dissenting). In *Priest*, the North Carolina Supreme Court adopted a dissenting opinion of this Court which determined that a substantial right was affected where, in applying the "actual malice" standard of fault of *New York Times v. Sullivan*, the trial court allowed a libel *per se* claim to survive summary judgment. *Priest*, 153 N.C. App. at 670-71, 571 S.E.2d at 80-81.

The facts of *Priest* involved statements made in a worker's union newsletter concerning complaints regarding whether union members could be forced to hire and work with non-union members. In evoking First Amendment guarantees as the basis for finding a substantial right, the dissent cited *New York Times v. Sullivan* as the standard adopted for libel suits arising under labor disputes. *See Linn v. United Plant Guard Workers*, 383 U.S. 53, 15 L. Ed. 2d 582 (1966). The dissent determined that if the "actual malice" standard was misapplied by the trial court, it could have a chilling effect on rights of free speech and thus affected a substantial right worthy of immediate appellate review. *Priest*, 153 N.C. App. at 670-71, 571 S.E.2d at 80-81. The dissent based its determination on *Sherrill v. Amerada Hess Corp.*, 130 N.C. App. 711, 719, 504 S.E.2d 802, 807 (1998) (where we reviewed a preliminary gag order restraining information of public concern from being relayed to the press by parties or their attorney, stating that it was a form of "prior restraint" in violation of the First Amendment prejudicing a substantial right.) The Court in *Sherrill* rested its substantial right analysis on *Kaplan v. Prolife Action League of Greensboro*, 111 N.C. App. 1, 15, 431 S.E.2d 828, 834, *appeal dismissed, disc. review denied*, 335 N.C. 175, 436 S.E.2d 379 (1993), *and cert. denied*, 512 U.S. 1253, 129 L. Ed. 2d 894 (1994) (where the Court found a substantial right prejudiced by the trial court's order issuing a preliminary injunction barring pro-life activists from picketing in front of a doctor's home). These cases all found a substantial right where the full breadth, or nearly full breadth ("actual malice"), of First Amendment protections of speech were implicated.

IV. Defendants' Speech Issue of Public Concern

Pursuant to the rationale of our Supreme Court's adoption of the dissent in *Priest*, we must now determine if defendants' speech at issue falls within some degree of First Amendment safeguards.

Defendants have not asserted in their brief, nor do we find as a matter of law, that plaintiff is a "public official" or "public figure" for First Amendment purposes. *New York Times*, 376 U.S. at 272, 11 L. Ed. 2d 686, 702 (public officials); *Gertz*, 418 U.S. at 345, 41 L. Ed. 2d at 808 (identifying types of public figures). Therefore, the case at bar necessarily falls out of the *Priest* and *New York Times v. Sullivan* paradigm. The question then becomes whether the First Amendment is implicated by Mr. Lingafelt's statements of 21 August 2002 because the content of those statements are a matter "public concern" where the First Amendment requires some degree of fault. *Gertz*, 418 U.S. at 347, 41 L. Ed. 2d at 809. If they are not, then North

Carolina's common law standards of libel govern plaintiff's claims without regard to the First Amendment, and this appeal is interlocutory. *Dun & Bradstreet*, 472 U.S. at 763, 86 L. Ed. 2d at 605; *See Renwick v. News and Observer*, 310 N.C. 312, 316, 312 S.E.2d 405, 408 (1984) (stating the common law presumptions in North Carolina for a claim of libel *per se*). If these statements are a matter of "public concern," then we must determine the level of First Amendment protection North Carolina affords such statements, and, when applying that degree of protection to defendants' speech, whether a substantial right is affected by the trial court's denial of summary judgment. North Carolina has yet to clearly set the scope for what is a matter of "public concern" in the context of protected speech in libel actions, and there is little guidance on point in other jurisdictions and federal case law. In *Dun & Bradstreet*, the Supreme Court provided some guidance for this determination: "In a related context, we have held that " '[whether] . . . speech addresses a matter of public concern must be determined by [the expression's] content, form, and context . . . as revealed by the whole record.' " *Dun & Bradstreet*, 472 U.S. at 760-61, 86 L. Ed. 2d at 604 (quoting *Connick v. Myers*, 461 U.S. 138, 147-48, 75 L. Ed. 2d 708, 720 (1983)). A similar examination of the content and surrounding circumstances of speech was applied by the North Carolina Supreme Court for determining whether a public employee's statements regarded a "matter of public concern" to warrant First Amendment protection:

> [O]nly speech on a matter "of public concern" is constitutionally protected. To determine whether speech fits in this category, the Court examines the content, form, and context of the public employee's speech.

*Corum v. University of North Carolina*, 330 N.C. 761, 775-76, 413 S.E.2d 276, 285-86 (citations omitted), *reh'g denied*, 331 N.C. 558, 418 S.E.2d 664, *cert. denied*, 506 U.S. 985, 121 L. Ed. 2d 431 (1992).

Defendants' four alleged libelous statements, set out in full above, were made four days after the sinkholes appeared at Buffalo's due to a heavy downpour. As attested to in plaintiff's interrogatories, the sinkholes were discussed throughout the community, nationally, and even internationally. There is evidence that CNN covered the issue over its ticker tape running at the bottom of the television screen stating, "After four months, Corvette pulled from sinkhole in Hickory, North Carolina." Additionally, there is evidence the story was covered by Fox morning news, "Shepard Smith's Across America," and seen on television in Germany. The record reveals that,

more than merely being newsworthy, the sinkholes were a matter of public study: two days after they developed, the sinkholes were discussed at the Western Piedmont Council of Government which was attended by a number of influential people, including members of North Carolina's Department of Transportation; North Carolina State University and University of North Carolina at Charlotte began teaching on the sinkhole subject; and that the Hickory Visitors Bureau received calls from as far away as Michigan asking how to find the sinkholes. Based on this record and in light of the clear safety ramifications the sinkholes posed to the community of Hickory, we find that determining the *cause* of the sinkholes was a matter of "public concern"—whether by insufficient site preparation by a contractor, regardless of which contractor, or by some greater geological force affecting the community at large.

As we have concluded that defendants' statements regarding the sinkholes were matters of public concern warranting some First Amendment Protection, we must next turn to the question of what degree of protection North Carolina provides such speech where the plaintiff is a "private individual."

V. North Carolina's *Gertz* Standard of Fault

*Gertz* and its progeny left for the individual states to determine what level of First Amendment protection "public concern" speech would be given where the plaintiff is a private individual. This was "so long as [states] do not impose liability without fault[.]" *Gertz*, 418 U.S. at 347, 41 L. Ed. 2d at 809.

North Carolina case law has not squarely set the standard of fault pursuant to *Gertz*. This issue has been presented to our Court in at least two prior cases, but it was not necessary to determine the *Gertz* standard in either because in both cases the plaintiff failed to establish any degree of fault, be it negligence or "actual malice." *McKinney v. Avery Journal, Inc.*, 99 N.C. App. 529, 393 S.E.2d 295, 297 (plaintiff "failed to forecast evidence which would meet even the lesser requirement that defendants were at fault or negligent . . ." and defendant was granted summary judgment), *disc. review denied*, 327 N.C. 636, 399 S.E.2d 123 (1990); *Walters v. Sanford Herald*, 31 N.C. App. 233, 228 S.E.2d 766, 767 (1976) (plaintiff's case was dismissed where her complaint failed to allege false publications were due to defendant's negligence or with defendant's knowledge of falsity or with reckless disregard.). However, in a diversity case, the federal Eastern District Court of North Carolina reading *McKinney* and

*Walker* found that "[i]n North Carolina, the applicable standard of liability is negligence." *English Boiler & Tube, Inc. v. W.C. Rouse & Son, Inc.*, 1997 U.S. Dist. LEXIS 15941 (*38-*43) (E.D.N.C. 1997), *aff'd without opinion*, 172 F.3d 862 (4th Cir. 1999).

Of premier and fundamental interest to the State of North Carolina is protecting the reputations of its citizens. Courts exist so that every person may have remedy by due course of law for any "injury done him in his lands, goods, *person, or reputation*[.]" N.C. Const., art. I, § 18 (emphasis added). The constitution also demands that freedom of the press not be restrained, "but every person shall be held responsible for the abuse" of the same. N.C. Const., art. I, § 14. In balancing these constitutional mandates, we now hold that North Carolina's standard of fault for speech regarding a matter of public concern, where the plaintiff is a private individual, is negligence. Such a standard strikes the sensitive balance between First Amendment tension regarding speech of "public concern," and maintaining the reputation and livelihoods of private individuals who are somehow harmed by the dissemination of this information.

VI. Substantial Right

Finally, we must determine whether the degree of constitutional protection over defendants' speech in this case affects a substantial right. In doing so, we examine whether misapplication of the "negligence" standard of fault for a defendant's speech regarding a private individual over a matter of public concern would have a chilling effect on defendant's rights to continue to disseminate speech of like content. We do not think that it would.

Our Supreme Court has stated: "[t]here is no more effective way to procrastinate the administration of justice than that of bringing cases to an appellate court piecemeal through the medium of successive appeals from intermediate orders." *Veazey v. Durham*, 231 N.C. 357, 363-64, 57 S.E.2d 377, 382 (1950). Thus, based upon the particular facts of each case and its procedural context, we extend substantial rights to warrant review of an otherwise interlocutory appeal with some restriction. *Waters v. Personnel*, 294 N.C. 200, 208, 240 S.E.2d 338, 343 (1978); *Blackwelder v. State Dept. of Human Resources*, 60 N.C. App. 331, 334, 299 S.E.2d 777, 780 (1983).

In this case, the particular facts evoke the question of whether defendants defamed plaintiff when issuing a statement injurious to plaintiff's reputation, the content of which was a matter of public

concern. In light of our adoption of the negligence standard of First Amendment protection of such speech, we look to general applications of this standard at summary proceedings. Summary judgment is a drastic measure, and should be approached cautiously. *Williams v. Power & Light Co.*, 296 N.C. 400, 402, 250 S.E.2d 255, 257 (1979). "This is especially true in a negligence case in which a jury ordinarily applies the reasonable person standard to the facts of each case." *Id.* Therefore, we believe the trial court was correct in leaving for the jury the factual question of whether defendants were negligent in their investigation of who did the site work at Buffalo's before issuing the injurious statements.

Moreover, while *Dun & Bradstreet* makes clear that First Amendment protections supplant a state's common law where the content is a matter of public concern, we do not believe the dissemination of information regarding a "private individual" is of a kind benefitted by the "uninhibited, robust, and wide-open" speech we see promoted by the "actual malice" standard of fault for public officials or public figures. *New York Times*, 376 U.S. at 270-71, 11 L. Ed. 2d at 701. Thus, we are not concerned that a trial court's application of the negligence standard of fault, beyond the stage of summary judgment, would have a chilling effect on free speech where "the substance of the defamatory statement 'makes substantial danger to reputation apparent.' " *Gertz*, 418 U.S. 323, 348, 41 L. Ed. 2d 789, 810. The negligence standard of fault does, and we believe should, provide its own cooling and deliberative effect on the kind of speech at issue in this case. Thus, finding a substantial right where it would not further any First Amendment protection would unnecessarily weigh against North Carolina's constitutional mandate that its courts of justice protect the otherwise good names of its private citizens.

Therefore, this interlocutory appeal is

Dismissed.

Judges McGEE AND ELMORE concur.