942 A.2d 850 (2008)
399 N.J. Super. 18
Michael BOYLE, Plaintiff-Respondent
v.
FORD MOTOR COMPANY, Defendant-Appellant, and
Intek Auto Leasing, New Jersey Boom & Erectors, Defendants/Third-Party Plaintiffs, and
Garden State Engine & Equipment Company, Third-Party Defendant.
Superior Court of New Jersey, Appellate Division.
Argued December 4, 2007.
Decided March 18, 2008.
*851 Douglas S. Eakeley, Roseland, argued the cause for appellant (Lowenstein Sandler, attorneys; Mr. Eakeley, of counsel and on the brief; Alan S. Modlinger and Natalie J. Kraner, on the brief).
John D. North, Woodbridge, argued the cause for respondent (Greenbaum, Rowe, Smith and Davis, attorneys; Mr. North, of *852 counsel and on the brief; Emily A. Kaller, on the brief).
Before Judges COBURN, FUENTES and GRALL.
The opinion of the court was delivered by
FUENTES, J.A.D.
This product liability case arises from an automobile accident in which plaintiff Michael Boyle was seriously injured when his car collided with a truck leased to and operated by defendant New Jersey Boom & Erectors ("NJBE"). Plaintiff alleged that the front-end of his car burrowed under the truck's undercarriage, pushing the hood of his car into the passenger compartment, and shearing the vehicle's roof. According to plaintiff, this occurred because the truck was not properly equipped with a rear bumper guard.
Defendant Ford Motor Company manufactures and sells the truck's chassis cab. The chassis cab, denoted by Ford as F-800, is designed and intended to be a generic vehicle, to be retrofitted and otherwise altered to meet the vehicle owner's use-specific needs. Here, NJBE, as the owner of the F-800, contracted with defendant Garden State Engine & Equipment Company ("GSEE") to attach a flatbed and tow crane on the F-800 chassis cab.
As part of this contract, GSEE also designed and installed a rear bumper guard, a device specifically intended to prevent the type of "burrowing" accident that occurred here. Despite these efforts, the force of the collision dislodged the truck's rear bumper guard, allowing plaintiff's car's front-end to insert itself under the truck's rear-frame.
On these facts, a jury found Ford liable, concluding that the F-800 chassis cab was defectively designed when it left Ford's control without a rear bumper guard. The jury also found Ford liable for failing to include, as part of the F-800 chassis cab, a rear bumper guard capable of being installed by the vehicle's end-user. In addition to these two liability-scenarios, the jury found Ford liable for failing to provide adequate technical assistance, to companies like defendant GSEE, about the various ways to provide rear bumper protection.
With respect to defendant GSEE, the jury found that the truck was defective when it left GSEE's control without adequate under-ride protection. In allocating liability, the jury found Ford seventy percent liable and GSEE thirty percent liable.[1] The trial court denied Ford's application for the jury to consider plaintiff's negligence in allocating responsibility for the accident.
The jury awarded plaintiff damages in the amount of $26,881,754, representing $279,354 for past lost wages, $1.6 million for future lost wages, $2,400 for medical costs, and $25 million for pain and suffering. In reaching these figures, the jury found that plaintiff would have sustained only 2.5% of his injuries if the truck's rear bumper guard safety device had responded as intended.
In response to Ford's motions for judgment notwithstanding the verdict, a new trial, or remittitur, the trial court denied the first two applications for relief, and granted the motion for remittitur, reducing the award for pain and suffering to $15.5 million. Plaintiff accepted the remittitur. The court thus entered a final judgment against Ford in the amount of $13,374,137.40, representing its seventy percent liability for plaintiff's enhanced injuries *853 and including prejudgment interest to the date of judgment.[2]
Ford now appeals arguing that the trial court erred when it made it legally responsible for the installation of the rear bumper guard on the F-800 chassis cab. Ford argues that the F-800 chassis cab was merely a component part of the finished truck involved in the accident. Given the multiple and unforeseeable modifications required to transform the F-800 into a finished product, Ford argues that it is not feasible nor practical to impose upon Ford the legal duty of installing this under-ride protection. As an alternative position, Ford argues that the trial court erroneously denied its application to have the jury consider plaintiff's negligence.
After reviewing the record, and in light of prevailing legal standards, we reverse. We agree with Ford that its role as the manufacturer of the chassis cab F-800 is consistent with that of a component product manufacturer. In this role, it is neither feasible nor practical to impose upon Ford the legal responsibility for installing or providing the safety device at issue here.
At the time of the accident, the F-800 chassis cab had undergone substantial modifications to meet the specific requirements of the truck's end-user. Consistent with industry practices and federal regulatory safety standards, the legal responsibility for installing the rear bumper guard must lie with the truck's final-stage manufacturer, because this entity is in the best position to determine the type of safety device needed.
We recognize that the chassis cab F-800 was mechanically capable of being driven on the public roadways when it left Ford's control without the rear bumper guard. Indeed, the record here shows that this particular chassis cab was actually driven, without the rear bumper guard, from Pittsburg, Pennsylvania to Secaucus, New Jersey, as part of a dealer's trade. If driven without the rear bumper guard, the F-800 would be deemed a defective component product as a matter of law. Thus, had the accident at issue here occurred during the "dealer's trade" voyage, Ford would have been liable for injuries proximately caused by such a defective component product.
By contrast, when the accident occurred here, the F-800 chassis cab had been substantially modified by the final stage manufacturer, including the installation of a rear bumper guard as required by federal regulations. It is thus practical and feasible to impose liability for the proper installation of this safety device upon the final stage manufacturer, because the features and installation requirements of the rear bumper guard needed to meet federal regulatory standards could only be known and ascertained when the final end-use of the truck was determined. Stated differently, the final stage manufacturer here was in the best position, in the chain of production, to determine what type of rear bumper guard best complied with the applicable safety standards.
In reaching this conclusion, we adhere to the "feasibility and practicality" standard articulated by our Supreme Court in Zaza v. Marquess & Nell, Inc., 144 N.J. 34, 675 A.2d 620 (1996). Our analysis is also informed by the Restatement (Third) of Torts: Products Liability § 5 (1998).
Applying these legal principles, we now hold that a manufacturer or distributor *854 of a component product is liable for the harm caused by the absence of a safety device in a finished product, when a plaintiff proves, by a preponderance of the evidence, that it was feasible and practical for such safety device to have been installed at the time the component product was within the control of the manufacturer or distributor. Zaza, supra, 144 N.J. at 51, 675 A.2d 620.
Alternatively, a manufacturer or distributor of a component product is liable for the harm caused by a defective finished product when: (1) such defect was caused by the integration of a defective component product into the finished product; or (2) the manufacturer or distributor of the component product substantially participates in the integration of the component product into the ultimate design of the finished product; and (i) the integration of the component causes the product to be defective; and (ii) the resulting defective product is a proximate cause of the harm. Restatement, supra, § 5.
Ford, as the manufacturer of the F-800 component product, is not liable for the injuries sustained by plaintiff because: (1) the injuries to plaintiff are not directly attributable to any defect in the component product; (2) there was no feasible or practical way for Ford to have installed the safety device in the finished product; and (3) Ford did not participate in any way in the integration of the component product into the finished product.
We will examine and discuss these issues in the following factual context.

I

The Accident
The accident occurred in January 2002, on Route 46 in Little Falls. The speed limit in this area is fifty miles per hour. There were only two vehicles involved in the accident: the truck and plaintiff's car.
The truck was a Ford F-800 chassis cab with a flatbed mounted on top of the frame rails securing a tow crane. The length of the truck's after-frame, (the portion of the frame beyond the rear axle), was 130 inches; the top of the frame rails was approximately 38 inches above the ground.
NJBE bought the F-800 chassis cab from a Ford dealership in this State. At the time of purchase, the truck had temporary brakes and tail lights, but no rear bumper guard. The Ford dealership did not advise NJBE to install a bumper guard before driving the chassis cab to GSEE's facility for installation of the flatbed and crane.[3] GSEE designed the rear bumper and used welds to attach it to the side of each frame rail. No other alterations were made to the truck or the bumper guard before the accident.
Plaintiff's car was a 1994 Ford Taurus. At the time of the accident, the truck was traveling at approximately forty-five miles per hour; plaintiff's car was traveling consistent with other vehicles on the road, at about fifty-five miles per hour. The accident occurred when plaintiff's car collided with the rear of the truck. In the initial impact, the truck's rear bumper separated and was "flung" away. The truck's driver did not feel the collision. He pulled *855 over only after a fellow motorist drove alongside the truck and alerted him to the situation.
As a result of the accident, approximately ten feet of plaintiff's car burrowed and became wedged under the truck's rear body. The car's hood was pushed inside the passenger compartment and its roof was sheared off. The truck's bumper guard was subsequently located on the other side of the road; it was slightly bent and had apparently snapped off on impact.
Plaintiff did not recall the accident. A police report indicated that he had been wearing seat restraints and hospital records revealed bruises on his chest consistent with the use of a safety belt. Ford does not dispute that plaintiff sustained serious brain and other injuries that left him with substantial and permanent physical, cognitive, and psychological impairments. More particularly, Ford does not challenge the jury's finding that plaintiff incurred nearly all of his injuries as a result of the car's insertion into the truck's rear section.

II

Regulatory Scheme
Trailers and semi-trailers manufactured after January 26, 1998, and with a gross vehicle weight of ten thousand pounds or more must have a "rear impact guard" that satisfies Federal Motor Vehicle Safety Standards No. 223, 49 C.F.R. § 571.223, and No. 224, 49 C.F.R. § 571.224. 49 C.F.R. § 393.86(a); Parts and Accessories Necessary for Safe Operation; Rear Impact Guards and Rear Impact Protection, 64 Fed. Reg. 47703 (Sept. 1, 1999). Those regulations set forth dimensional standards for the guards, performance standards for strength and energy absorption, test protocols, and a mandate to follow the guard manufacturer's installation instructions. 49 C.F.R. §§ 571.223, 571.224. The stated purpose of these standards is "to reduce the number of deaths and serious injuries that occur when light duty vehicles collide with the rear end of trailers and semitrailers." 49 C.F.R. § 571.223; accord 49 C.F.R. § 571.224 (using equivalent language).
Under 49 C.F.R. §§ 567.3, 558.3, the F-800 is considered an incomplete vehicle. Thus, in recognition that incomplete vehicles undergo substantial changes, 49 C.F.R. § 568.6, requires a "final stage manufacturer" to:
complete the vehicle in such a manner that it conforms to the applicable standards in effect on the date selected by the final-stage manufacturer, including the date of manufacture of the incomplete vehicle, the date of final completion, or a date between those two dates. This requirement shall, however, be superseded by any conflicting provisions of a standard that applies by its terms to vehicles manufactured in two or more stages.
At the request of NJBE, the final stage manufacturer, GSEE, agreed to modify the F-800 to meet its owner's use-specific requirements. The contract called for the installation of a telescopic crane and Omaha Standard 22' 6" body. This included stake pockets, banding rail, 48-inch headboard, mud flaps, new body lights, and rear bumper guard identified as an "ICC bar."

III

Work Performed by GSEE
At trial, the president of GSEE Paul Baldasarre described the company's business as "installing and maintaining, servicing truck mounted cranes." At the time of this particular job, GSEE had approximately sixteen to eighteen employees, at least eight of whom were mechanics. The *856 company operated from Somerville, New Jersey; Allentown, Pennsylvania; and Deer Park, Long Island.
With respect to the particular rear bumper guard or "ICC bar" used in this finished truck, Baldasarre testified that GSEE "fabricated and installed" the device, without any consultation from any outside source. He also believed it to be his company's legal responsibility, as the final stage manufacturer, to deliver the finished truck equipped with the appropriate ICC bar. When it completed the work specified by the truck's end-user, GSEE affixed a label on the vehicle itself certifying that the truck, including the rear bumper guard, conformed with all applicable safety standards.
The particular ICC bar installed here was a tubular device, measuring three and a half inches by three and a half inches, by a quarter inch. It was installed at GSEE's Allentown site. The cost of materials used in its fabrication was approximately one hundred dollars. Although GSEE fabricated this particular device itself, there are a number of companies that manufacture and market similar devices to final stage manufacturers like GSEE. The precise design specifications for these commercially available rear bumper devices are closely regulated by the United States Department of Transportation, as part of the Federal Motor Vehicle Safety Standards. 49 C.F.R. § 571.223. Final stage manufacturers using these commercially available ICC bars are required to follow the guard manufacturer's installation instructions. 49 C.F.R. §§ 568.6, 571.223, 571.224. The stated purpose is "to reduce the number of deaths and serious injuries that occur when light duty vehicles collide with the rear end of trailers and semitrailers." 49 C.F.R. § 571.223; accord 49 C.F.R. § 571.224 (using equivalent language).

IV

Ford's Role
According to Daniel May, a design analysis engineer at Ford who had been the design engineering supervisor for the F-800's frame and other systems, the chassis cab is an incomplete vehicle, not intended for operation on public roads. Driving a chassis cab without a rear bumper guard renders the incomplete vehicle defective, because the absence of this device creates the risk of an under-ride accident.
To avoid this risk, F-800 chassis cabs were typically driven on public roads to Ford dealers in a "piggy-back" arrangement of four or five, with the first serving as the tractor and each of the others resting its front wheels on the frame of the one ahead of it. Through this approach, the frame rails of all but the last one to be delivered would be tilted and therefore closer to the ground.[4]
May specifically addressed the variety of customer end-uses of a modified F-800. Some finished vehicles, like garbage trucks, had working parts that extended downward behind the rails and served the same function as an under-ride guard. However, the great variety of possible vocational bodies precluded a uniform approach to under-ride protection. It was therefore not feasible for Ford to address the bumper guard issue at this stage of production, because Ford had no way to *857 ascertain how any incomplete vehicle would be finished after leaving its control. Those same obstacles made it unfeasible for Ford to equip each chassis cab with an under-ride guard and instructions on attaching it.
Accordingly, Ford followed the decades-long industry practice of relying on the subsequent final stage manufacturer to address the risk of an under-ride accident. Through this approach, each final stage manufacturer is able to take advantage of state of the art technology to select the commercially available under-ride safety device best suited to meet the finished product's intended use.
Ford involved itself in this process only when a customer asked it to "arrange to have the vehicle completed." In these circumstances, Ford would work with the Manning Modification Center, a finisher that would perform all the completion work, which included acquiring or fabricating the required rear bumper, and thereafter installing it in the finished truck. In these situations, Ford did not give Manning instructions or design specifications. Rather, Ford's involvement was limited to inspecting the finished vehicle to ensure satisfaction with all applicable federal regulations, including the requirement for under-ride protection.
May described Ford's "Medium Heavy Truck Data Book," which covered the F-800, as intended solely for consultation by dealers in determining how large a vehicle the customer would need. This publication referred to under-ride guards only by citing the regulation that required them for vehicles with bodies thirty inches above the ground; stating that their purpose was "to prevent an automobile from burrowing under the body in rear-end collisions"; and naming a "simple" bumper in the short list of acceptable examples. The same limited discussion of under-ride protection appeared in the Ford manual titled "The Basics of Truck Selection."
The Ford "1998 Heavy Truck Incomplete Vehicle Manual," sets forth "the specific conditions under which an incomplete vehicle may be completed to conform with each applicable Federal Motor Vehicle Safety Standard," in order to "aid subsequent stage manufacturers in avoiding instances of inadvertent noncompliance to particular standards." This publication made clear, however, that the final stage manufacturer remained responsible for compliance with any federal regulatory requirements, because these regulations required such final stage manufacturers to furnish a certification to that effect.
The publication listed a toll-free telephone number for Ford's "heavy-truck advisory service," which, according to May, would answer questions about welding on the frame rails and would engage in "a detailed conversation about the right way" to shorten the frame rails "without compromising the integrity of the vehicle." However, this service would not give advice on under-ride guards or on designing a vocational body to confer under-ride protection.
Ford's 1997 "Body Builder's Layout Book," which covered a wide variety of incomplete trucks including the F-800, was mostly a general reference about the trucks' construction and systems. It prohibited welding on frame rails made of high-strength steel because the heat could weaken them, and it prohibited drilling in the upper or lower flanges. It permitted the drilling of bolt holes in the side of the frame rail but limited their diameter and their proximity to the flanges. Bolting through the side of the rails was required when securing the base of a fifth-wheel trailer mount, while U-bolts, which wrapped around a rail without requiring *858 any bolt holes, could be used to mount a vocational body.

V

Plaintiff's Theory of Liability
As the trial court explained to the jury in its final charge, plaintiff claims that the chassis cab was defective because: (1) Ford did not equip the chassis cab F-800 with a rear bumper guard to prevent the type of accident that occurred here; (2) Ford did not supply the final stage manufacturer with a bumper guard capable of being installed when the final modifications were completed; or (3) Ford did not supply instructions to the final stage manufacturer for the proper installation of a suitable rear bumper guard. However, as plaintiff acknowledges in his brief before us, his cause of action did not include a "failure to warn" theory of liability. Rather, plaintiff argues that Ford's failure to provide adequate instructions was related to its design defect claim.
Steven Batterman, a retired professor of engineering and bioengineering at the University of Pennsylvania, testified as plaintiff's expert on engineering and crashworthiness. Both in his testimony and in his preliminary expert report, Batterman acknowledged that federal regulations do not contain strength or performance standards for the rear bumper of "incomplete chassis cab," like the F-800. In his opinion, however, the failure of the bumper on NJBE's finished truck showed that the vehicle was defective.
According to Batterman, the chassis cab manufacturer should and could provide such protection, because the effectiveness of an under-ride guard depended on its attachment to "strong frame members." This method of attachment would transfer the collision forces for safer dissipation upon impact. The manufacturer could accommodate the variety of vocational bodies, and the need to alter the chassis cab frame for installing some of them, by providing an unattached under-ride guard with installation instructions. The lack of such a rear bumper guard here made NJBE's truck defective. Batterman opined that both GSEE and Ford bore responsibility for such defect. Specifically, GSEE should have attempted to communicate with Ford on the proper design and installation of the under-ride guard; and Ford should have made this type of technical support readily available to final stage manufacturers such as GSEE.
Batterman also described feasible alternative designs for effective under-ride guards. Additionally, he testified about the substantial engineering literature on scientific tests of under-ride guard designs. The literature demonstrated the effectiveness of alternative designs.
Such under-ride guards would be attached by bolts, (which Ford allowed), and they would not need to be welded onto the frame rails. Trucks like NJBE's, which needed under-ride protection due to a lengthy after-frame, had plenty of room along the after-frame for diagonal braces that would not impair their operation or utility. By contrast, the bumper that GSEE designed for NJBE's truck relied on the strength of the welds to the sides of the frame rails; the bumper separated when one of those welds failed.
Batterman opined that it was unreasonable of Ford to leave the task of designing and installing such rear bumper protection devices to the final stage manufacturer, because it was unreasonable to expect companies like GSEE to provide effective under-ride protection without its guidance. Based in part on published technical articles, Batterman opined that several reasonable alternative designs existed for effective under-ride guards; these devices *859 could be readily adapted to any particular truck without requiring new technology; and that it was practical and feasible for the chassis cab manufacturers to provide them, notwithstanding the variety of vocational bodies.

VI

Ford's Defense
John Toner, a member of the Society of Automotive Engineers and other professional associations, testified as Ford's expert on trucking industry practices and the crashworthiness of chassis cabs. He opined that the absence of "specific strength requirements" for the rear bumpers of single-unit trucks, like the F-800, indicated that "it is left to the installer to evaluate" the meaning of the regulatory term "substantially constructed," and then "to mount the bumper by whatever method seems appropriate."
Compliance with the regulations was the responsibility of the vehicle's owner, because the "[p]urchasers of this type of truck are sophisticated buyers who understand the vehicle, the requirements, and regulations that apply." Industry practices reflect this reality. The variety of vocational bodies, the option of mounting the rear bumper guard to the body or the chassis cab's frame, or both, are all decisions that must be made at the key point when the vehicle's end-use is finally determined. Thus, the party best suited to customize the safety device to the vehicle's final configuration is the final stage manufacturer.
Elaborating on this point, Toner emphasized that the great variety of vocational bodies made the installation of rear-impact protection at the last stage of a vehicle's preparation the most practical and reasonable design approach. Although most final stage manufacturers were relatively small companies that did not employ engineers, they had the technical means of conducting the tests necessary to ascertain whether a particular safety device was structurally suited for its intended use.

VII

Legal Analysis
Plaintiff's cause of action is governed by the New Jersey Product Liability Act, N.J.S.A. 2A:58C-1 to -7. Koruba v. American Honda Motor Co., 396 N.J.Super. 517, 531, 935 A.2d 787 (App.Div.2007). To prevail, "a plaintiff must prove that the product was defective, that the defect existed when the product left the manufacturer's control, and that the defect proximately caused injuries to the plaintiff, a reasonably foreseeable or intended user." Myrlak v. Port Authority of N.Y. and N.J, 157 N.J. 84, 97, 723 A.2d 45 (1999).
To prevail here, plaintiff must prove, by a preponderance of the competent evidence, that Ford is liable for the injuries he sustained when his car collided with and burrowed under NJBE's truck, because the F-800 chassis cab "was not reasonably fit, suitable or safe for its intended purpose because it, . . . was designed in a defective manner." N.J.S.A. 2A:58C-2.
The record shows that at the time it left Ford's control the F-800 chassis cab: (1) did not have the rear bumper guard; (2) was capable of being driven on a public roadway without this safety device; and (3) was in fact driven a significant distance without this safety device.
It is also undisputed that at the time of plaintiff's accident, the F-800 chassis cab had been substantially modified by GSEE to meet NJBE's specific use-requirements. These modifications included the installation of a rear bumper guard. Federal regulations require final stage manufacturers like GSEE to certify that the vehicle, *860 as modified, complies with all safety requirements, including, specifically, the rear-bumper guard. 49 C.F.R. §§ 568.6, 571.223, 571.224.
In rejecting Ford's arguments, the trial court noted that a manufacturer has a duty to install necessary safety devices whenever feasible. The manufacturer of a defective component can be strictly liable if the defect was not substantially altered by the component's integration into the final product, notwithstanding industry custom and the satisfaction of existing safety regulations. The court also focused its analysis on the practice of delivering F-800 chassis cabs to dealers or between dealers by driving them on public roads.
Additionally, the court found that Ford had a feasible and practical way to provide under-ride protection, because under-ride guards had been commercially available since the 1970s; they could be designed for attachment by bolts, which would have facilitated their removal or omission when the particular vocational body eliminated the need for one. Thus, according to the trial court, providing a removable under-ride guard would have required practices little different from Ford's delivery of incomplete F-800 chassis cabs with other temporary fittings like tail-lights.
In our view, this approach misapprehends and misapplies basic principles of product liability law. The Restatement Third of Torts: Products Liability, § 5, provides that:
One engaged in the business of selling or otherwise distributing product components who sells or distributes a component is subject to liability for harm to persons or property caused by a product into which the component is integrated if:
(a) the component is defective in itself, as defined in this Chapter, and the defect causes the harm; or
(b)(1) the seller or distributor of the component substantially participates in the integration of the component into the design of the product; and
(2) the integration of the component causes the product to be defective, as defined in this Chapter; and
(3) the defect in the product causes the harm.
The comment to the restatement explains the analytical rationale behind this approach:
a. Rationale. Product components include raw materials, bulk products, and other constituent products sold for integration into other products. Some components, such as raw materials, valves, or switches, have no functional capabilities unless integrated into other products. Other components, such as a truck chassis or a multifunctional machine, function on their own but still may be utilized in a variety of ways by assemblers of other products.

As a general rule, component sellers should not be liable when the component itself is not defective as defined in this Chapter. If the component is not itself defective, it would be unjust and inefficient to impose liability solely on the ground that the manufacturer of the integrated product utilizes the component in a manner that renders the integrated product defective. Imposing liability would require the component seller to scrutinize another's product which the component seller has no role in developing. This would require the component seller to develop sufficient sophistication to review the decisions of the business entity that is already charged with responsibility for the integrated product.
The refusal to impose liability on sellers of non-defective components is expressed in various ways, such as the *861 "raw material supplier defense" or the "bulk sales/sophisticated purchaser rule." However expressed, these formulations recognize that component sellers who do not participate in the integration of the component into the design of the product should not be liable merely because the integration of the component causes the product to become dangerously defective. This Section subjects component sellers to liability when the components themselves are defective or when component providers substantially participate in the integration of components into the design of the other products.
[Restatement, supra, § 5 comment a (emphasis added).]
Our Supreme Court endorsed this approach in Zaza, supra, 144 N.J. at 52-54, 675 A.2d 620.[5] The component product manufactured by the defendant in Zaza was a metal quench tank with certain openings that was incorporated into the second stage of a "large, complex manufacturing process  the Maxwell House trecar-carbon regeneration system  which is used to produce decaffeinated coffee beans." Id. at 42, 675 A.2d 620. The system also included a multiple-hearth furnace and numerous additional apparatuses all of which were designed by Maxwell. Ibid. The system's design included three safety devices to prevent overflows from the tank, but the devices had not been installed when an overflow injured the plaintiff. Id. at 43-44, 675 A.2d 620.
The Zaza Court emphasized that plaintiff was not alleging "any manufacturing defect in the quench tank itself." Id. at 55, 675 A.2d 620. Thus, applying the principles of feasibility and practicality, the court reached the following conclusion:
[I]t was not feasible, practical, or reasonable for defendant, a sheet metal fabricator with no prior experience in the assembly and installation of trecar-carbon regeneration systems, to attach the safety devices to the quench tank. The safety devices could not have been incorporated into the quench tank at its factory. The shut-off valve was not located in or on the quench tank, but rather in the chute between the hearth furnace and the tank. Similarly, installation of the overflow line required that the tank be first installed in Maxwell House's plant. Further, defendant lacked the expertise required to attach the safety devices and to integrate the tank into the trecar-carbon regeneration system  a system that was actually composed of separate "systems" interfacing with one another.
Furthermore, the work performed by Maxwell House and its assemblers in order to integrate the quench tank into the trecar-carbon regeneration system constituted a substantial change to the quench tank. Before it became part of the complex trecar-carbon regeneration system, the quench tank was merely an isolated unoperative component. It was not until it was installed as part of the regeneration system that it became a functional, operative product.

As stated previously, the critical issue in design-defect cases is the reasonableness of the manufacturer in marketing that design. International acted in a reasonably prudent manner in fabricating the quench tank and in delivering it to Maxwell House without incorporating the safety devices. It was not feasible or practical for defendant to attach the *862 safety devices to the tank. International manufactured the quench tank in strict accordance with the specifications provided by Maxwell House, a knowledgeable and experienced purchaser and user. International was not the designer, manufacturer, or installer of the trecar-carbon regeneration system.
[Id. at 55-56, 675 A.2d 620 (emphasis added).]
Here, the salient facts lead to the same analytical destination. Given the multiple, unforeseen uses to which the F-800 could be put to by its ultimate end-user, it was neither practical, feasible nor reasonable to require Ford to install the rear guard device at issue here. The safety device could not have been pre-installed by Ford, because, depending on the vehicle's enduse, such a device could have been ineffective, inadequate, or unnecessary.[6]
Despite its vast financial and automotive technical resources, Ford is not in the best position to determine the safety device needed, and thereafter design and fabricate such a device. This is so, because the type of safety device needed will always depend upon the nature of the completed truck's use. By contrast, as the final stage manufacturer, GSEE is, by far, in the best position to ascertain the safety needs of the modified F-800.
As the record illustrates here, once the safety concerns were identified, GSEE could have either designed and manufactured the particular device required (as it did here), or purchase a suitable, commercially available, prefabricated device. In either scenario, it was GSEE that was commissioned by the owner of the F-800 chassis cab to make all of the required modifications; and thereafter certify the vehicle's compliance with all relevant federal regulatory safety standards. See 49 C.F.R. §§ 568.6, 571.223, 571.224. More importantly, GSEE was the only entity in the chain of production that was fully aware of the completed vehicle's final use before the truck was driven on a public road.
We recognize that, unlike the quench tank in Zaza, supra, which the Court noted was "merely an isolated [in]operative component", 144 N.J. at 56, 675 A.2d 620, the F-800 chassis cab was fully capable of being driven without the required safety device. Indeed, this particular F-800 was actually driven a considerable distance without the required safety device. Thus, had the accident occurred during this stage of the process, Ford's role in this liability analysis would be quite different. The fact remains, however, that the accident occurred well after the F-800 had undergone the substantial changes performed by the final stage manufacturer, GSEE, at the behest of its owner, NJBE.
Thus, as the Zaza Court emphasized: "the critical issue in design-defect cases is the reasonableness of the manufacturer in marketing that design." Ibid. Here, we are satisfied that Ford's decision to market the F-800 without the rear bumper guard was reasonable, because the chassis cab was designed and intended as an incomplete component product. The customer base for such a component product consists of sophisticated end-users, who specifically require the F-800 chassis cab to be a generic platform, readily capable of being modified to meet the owner's particular needs.
Both the federal regulatory scheme and the long-established industry practices *863 reflect this reality; from a feasibility perspective, it is entirely reasonable to expect the final stage manufacturer to design and install the specific safety device needed. Such a determination can rationally be made only after the vehicle's end-use has been determined. As the component manufacturer, Ford is ill-suited to assume this legal responsibility.
This approach was also endorsed by the Court in Michalko v. Cooke Color & Chem. Corp., 91 N.J. 386, 451 A.2d 179 (1982). In Michalko, the court considered whether "an independent contractor that rebuilds part of a machine according to the specifications of the owner can be held strictly liable for injuries sustained by a foreseeable user of the machine when the contractor failed to make the machine safe or to warn of the dangers inherent in its use." Id. at 390, 451 A.2d 179.
After reviewing the basic principles of strict liability for design defects, the Michalko court rejected the final stage manufacturer's defense that it was simply following the dictates of the product's owner. Id. at 394-96, 451 A.2d 179. In so doing, the Court held that:
[O]ne engaged in rebuilding machines or manufacturing component parts [is legally liable] . . . when it is feasible for the rebuilder of machinery or the manufacturer of component parts to incorporate a safety device and it fails to do so, the rebuilt machine or component part will be deemed to be a defective product when delivered by the manufacturer to its owner. Further, the fact that the product was built according to the plans and specifications of the owner does not constitute a defense to a claim based on strict liability for the manufacture of a defective product when the injuries are suffered by an innocent foreseeable user of the product.
[Id. at 395, 451 A.2d 179.]
Here, this analysis applies with equal force to GSEE, the entity retained by the owner of the F-800 to make the final modifications to the truck involved in causing plaintiff's injuries.

VIII
Procedurally, the issues discussed here come before us as an appeal from the trial court's denial of Ford's pre and post verdict motions to dismiss plaintiff's cause of action as a matter of law. Motions for judgment, whether made under R. 4:37-2(b) at the close of the plaintiff's case, under R. 4:40-1 at the close of evidence, or under R. 4:40-2(b) after the verdict, are governed by the same standard: "`[I]f, accepting as true all the evidence which supports the position of the party defending against the motion and according him the benefit of all inferences which can reasonably and legitimately be deduced therefrom, reasonable minds could differ, the motion must be denied. . . .'" Verdicchio v. Ricca, 179 N.J. 1, 30, 843 A.2d 1042 (2004) (citations and quotations omitted); accord Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 523, 666 A.2d 146 (1995). This standard applies both at trial and on appeal. Frugis v. Bracigliano, 177 N.J. 250, 269, 827 A.2d 1040 (2003).
We are satisfied that, as a matter of law, the trial court erred in denying Ford's motions to dismiss. Accordingly, we need not, and specifically do not reach the remaining issues raised by Ford in the appeal.
Reversed.
NOTES
[1] GSEE settled with plaintiff after the verdict.
[2] Reduction of the original total jury award of $26,881,754 by the $9.5 million remittitur yielded $17,381,754; subtracting 2.5% for plaintiff's un-enhanced injuries left $16,947,210, of which Ford's seventy percent share was $11,863,047.
[3] The work performed by GSEE to the chassis cab is generally described as a "vocational body." Throughout the record, GSEE and any other companies that installed vocational bodies and performed whatever additional work was required for legal use of the completed vehicle on public roads, were referred to as "finishers," "final stage manufacturers," or "subsequent manufacturers." We have opted to refer to GSEE as a final stage manufacturer.
[4] This testimony was disputed by Edward LaTourette, the general sales manager at the Ford dealership in New Jersey where NJBE bought its chassis cab. According to LaTourette, Ford did not instruct dealers to prohibit an incomplete truck from being driven on public roads without an under-ride guard, because Ford understood that driving one was the only practical way to transport it between dealers or from the dealer to the finisher.
[5] In reaching this conclusion, the Zaza court reviewed the case law generated by the various jurisdictions that have considered and applied the liability principles outlined in the Restatement.
[6] As in the case where the end-user's truck configuration lowers the vehicle's rear to less than thirty inches from the ground.