**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3391-20

JOE OBI OKEKE,

     Plaintiff-Appellant,

v.

CHINEDU SANI ANEKWE,

     Defendant-Respondent.

_____

Submitted May 9, 2022 – Decided July 12, 2022

Before Judges Rothstadt and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-2338-18.

Dianne Glenn, attorney for appellant.

Corinne M. Mullen, attorney for respondent.

PER CURIAM

    Plaintiff Joe Obi Okeke appeals from a June 14, 2021 order dismissing his defamation action against defendant at the close of his proofs under Rule 4:40. On appeal, plaintiff argues the court mistakenly dismissed his complaint as he

established a prima facie case of defamation. He also contends the court erroneously applied the actual-malice standard rather than the ordinary negligence standard for a private plaintiff in a matter of private concern. For the following reasons, we affirm in part, reverse in part, and remand.

I.

Plaintiff alleged defendant posted false and defamatory statements regarding his accounting practice on Facebook and Yelp and accused defendant of filing a false complaint with the Better Business Bureau (BBB). Plaintiff requested defendant delete those comments and issue a retraction. He also sought compensatory damages. After an unsuccessful mediation, the parties proceeded to trial, where plaintiff, his wife, and a client testified, and from which we derive the following facts.

Defendant hired plaintiff as his accountant in 2013, and plaintiff continued to assist defendant with his tax needs for the following five years. Plaintiff testified that he understood defendant to be satisfied with his services during this period, claiming "there w[ere] no issues" between the two.

In 2017, defendant learned that he owed the federal government $3,910 with respect to his 2014 taxes after he failed to report income related to his service in the National Guard. Defendant was displeased, as his previous federal

2

refunds allegedly exceeded $7,000. Plaintiff faulted defendant for failing to provide his W-2 related to his National Guard revenue, resulting in plaintiff failing to report the associated income when filing defendant's taxes.[1]

Defendant inquired as to how he might be able to avoid paying the additional taxes and penalties or obtain a higher refund. Plaintiff and defendant agreed to meet to review defendant's previous tax filings and discuss defendant's options. In anticipation of that meeting, plaintiff offered to prepare an illustrative filing for a married couple filing separately to determine if that alternate option would reduce defendant's tax obligations.

According to plaintiff, defendant failed to arrive at plaintiff's office at the scheduled time, and defendant ascribed blame to plaintiff for the missed meeting. The following exchange ensued via text message:[2]

> [Defendant]: Good morning, Obi, I wasn't able to call yesterday as I became very busy. I only have two days off this week, this is really important for me to get this

---

[1] We note there is a discrepancy in the record as to the tax year for the omitted W-2 form. Defendant asserts plaintiff's error related to his 2014 taxes, but he mistakenly referred to the "2016 tax returns" in his posts because the Internal Revenue Service (IRS) notified him of the omission in 2017. This discrepancy does not affect our analysis, as we agree with the trial judge that the statements consist of defendant's opinion. See infra at pp. 14-15.

[2] We restate the text messages and related posts in their original form to provide appropriate context, as the meaning of the abbreviated words is easily discernable.

A-3391-20

done but it seems like you're extremely busy and I have to call just to set up a time to come over and see you. This is not very convenient for me. I'm just gonna stop by in afternoon and pick up my documents maybe we can try this again some other year.

[Plaintiff]: Chinedu . . . if it were in my younger days I will curse I our very badly. Instead of u telling me straight up you want to go elsewhere to do ur taxes, u want to blame me for nothing. We agreed u wld call me on Mon when u get off work, I never heard from [you]. When now I do, u come up with this junk. You are frustrated u owe taxes & u want to play games to get around. I hv even finished the [three] versions we discussed & was ready to discuss it when u come but u nvr called or came. Why blame me for anythg. I wish u luck in trying to get around paying ur taxes. You can come this evening at 5:30 & pick up you docs. Good bye.

[Defendant]: Are you out of your mind? I'm coming NOW! Give me my shit. You must be drunk! I'm driving there now you better be there. I'm definitely going to say your name to the Better Business Bureau because this is not how you talk to your customer under any circumstances and I'm going to place your information on ALL the African community members that I know to not come to YOU because this is so unbelievable that you would write this kind of mess. I came to office and you were not there. Please be there by 5:30 pm if not I will put it to the authorities. Please have every single ounce of documentation that you have of me I do not want you holding anything of mine EVER! Delete all my data! . . . FYI I was going to [d]o the tax Myself because it was a WASH. But that is NONE of your business anymore. See you 5:30 pm prompt!

4

[Plaintiff]: Wow, Chinedu, wow. Nvr in wildest imagination wld I think u will behave this way, unbelievable. But I hv been around for a while & I tend not to be too surprised these days. You need to know one thg though, u do not control my destiny. U cannot make or unmake me!!! I'll see u at 5:30 to pick up ur docs. Good bye.

[Defendant]: You should never speak to your clients in that manner you were exceptionally rude!

[Plaintiff]: I'm the one who was rude??? Cld u read the texts all over again? Or better yet ask an objective person to do so. Then u tell me how I was rude to u. You need to know there are some ppl not worth hvg as a client. I'm always overly nice to my clients until they go out of line & u were way out of line. At that point, I don't care abt u being my client anymore. The reason I'm responding to u now is bcos I won't say anythg to u when u come to pick up ur docs. And pse don't say anythg to me when u come. Finally, u came with all the threats not knowing I hve the ace up on u. You don't think IRS might want to know why u r filing differently from ur wife. So, my man, like the saying goes, don't throw stones when u live in a glass house.

Plaintiff testified that he was "really surprised" by defendant's texts, but nevertheless agreed that defendant could come to the office to retrieve his documents from plaintiff's wife, his office manager at the time. Plaintiff prepared a letter for defendant to sign and acknowledge receipt of the files. Defendant signed the letter and left the office with his documents.

5

A-3391-20

That same day, defendant filed a complaint with the BBB. He reported the text messages he received from plaintiff, which he described as "exceptionally irresponsible." The BBB informed plaintiff of the complaint via letter. Defendant also filed a complaint with the Department of Consumer Affairs and posted a message on the Hillside Community Forum on Facebook, as well as on Yelp, giving plaintiff's business a one-star rating out of five. The Facebook and Yelp posts stated:

> Facebook:
>
> Public Service Announcement: If you happen to use OKEKE CPA LLC (Obi) on 1673 Springfield Ave., Maplewood, NJ as a tax preparer PLEASE DO NOT! I used him for two years in a row and not only did he mess up my tax returns for 2016 causing me and my family to File an adjusted the tax returns, but this year when I told him I would no longer be with him he sent me a text laced with INSULTS and CURSES. He stated I was "dumb for leaving" "I am only leaving to commit Fraud!" "I am a loser" " and when I said I would tell others about his actions, he said "I don't need you or your business!" Anyone who know me, knows I am not the explosive kind. I don't take a lot of things personally and I do report my facts inaccurately. I would never falsely accuse anyone for anything . . . but THIS, I reported to the [BBB]. I filed a compliant with department of consumer affairs as well. If I was I was a person in a different neighborhood, there's no way tax prepare would speak to me in that manner. One of the reasons why local businesses teat us the way they do to is because we except it. They know they can say whatever they need to and there will be no follow up.

6

But I'm not going to let this go.  I WILL follow up my complaints to ensure that no one else gets treated this way.  I'm tired of being second-class citizen in my own neighborhood.

Yelp:

Public Service Announcement:  If you happen to use OKEKE CPA LLC (Obi) on 1673 Springfield Ave., Maplewood, NJ as a tax preparer PLEASE DO NOT!  I used him for two years in a row and not only did he mess up my tax returns for 2016 causing me and my family to File an adjusted the tax returns, but this year when I told him I would no longer be with him he sent me a text laced with INSULTS and CURSES.  He stated I was "dumb for leaving" "I am only leaving to commit Fraud!" "I am a loser" " and when I said I would tell others about his actions, he said "I don't need you or your business!"  Anyone who know me, knows I am not the explosive kind.  I don't take a lot of things personally and I do report my facts accurately.  I would never falsely accuse anyone for anything . . . but THIS I reported to the [BBB].  I filed a compliant with department of consumer affairs as well.  If I was I was a person in a different neighborhood, there's no way text prepare would speak to me in that manner.  One of the reasons why local businesses react the way they do to is because we except it.  They know they can say whatever they need to and there will be no follow up. But I'm not going to let this go.  I will follow up my complaints to ensure that no one else gets treated this way.  I'm tired of being second-class citizen in my own neighborhood.

Plaintiff explained that he did not find out about the online postings until

Angeline Gabriel, his friend and client, informed him that she had seen them.

7

Plaintiff stated that he felt defendant had "destroyed what [he] worked so hard for to build up in a certain community."  Plaintiff further testified that he had lost business opportunities and had difficulty signing new clients because of the postings.

On cross-examination, plaintiff admitted that the posts expressed defendant's opinion of plaintiff as a tax preparer, but also challenged the truth of defendant's postings, particularly the comment that plaintiff had "messed up" defendant's 2016 tax returns.  Plaintiff denied responsibility for any amendments to the tax returns required by the IRS, and stressed that the quotations were not remarks he made.

At the close of plaintiff's proofs, defendant made a motion for judgment under Rule 4:40-1, arguing that plaintiff had not established a prima face case of defamation.[3]  The court permitted the parties to brief the issue, and heard arguments at a June 14, 2021 hearing, at the conclusion of which, the court granted defendant's motion, reasoning that plaintiff had not satisfied the standard for defamation under Ward v. Zelikovsky, 136 N.J. 516, 529 (1994).

---

[3] Counsel moved for a "directed verdict," which the judge understood as a Rule 4:40-1 motion as the application was "made at the close of the whole case or at the close of the opposition's case."

A-3391-20

The court characterized the "critical issue" as "the nature of the practice of [plaintiff]" and whether the IRS required corrections on defendant's 2016 tax returns. The court found the IRS required adjustments after defendant failed to provide an additional W-2 form, and therefore owed money on his federal taxes. Whether this omission was the fault of plaintiff or defendant, the court noted, was immaterial to the "objective test of true or false" that it applied.

The court also concluded defendant's postings were "opinion speech" protected by the First Amendment. In doing so, the court reasoned that defendant was entitled to his opinion, even it encompassed unrealistic expectations of plaintiff's duty to collect tax information from him. Further, the court determined that plaintiff did not prove actual malice, and as such, there could be no "causation." Accordingly, the court granted defendant's application and entered an order of dismissal on June 14, 2021. This appeal followed.

## II.

Before us, plaintiff argues the trial judge erred in granting defendant's motion as defendant's Internet postings were defamatory. Plaintiff initially challenges the court's conclusion that defendant's postings were protected opinion speech. He maintains defendant's postings on Facebook and Yelp were

9

"knowingly false" and included "reasonably specific assertions of fact." Ward, 136 N.J. at 531. We agree with plaintiff's arguments in part.

Plaintiff contends the postings primarily contained two types of accusatory statements warning other community members not to use plaintiff's services. First, plaintiff claims defendant falsely asserted he "mess[ed] up" defendant's taxes, which required an adjusted tax return. Second, he maintains defendant incorrectly posted that plaintiff cursed at and insulted him, calling defendant a "loser," and claimed defendant was taking his business elsewhere only so that he could "commit [tax] fraud." We are satisfied that the first statements were not defamatory, but we remand with respect to the second statements.

We review a Rule 4:40-1 motion for judgment de novo. Boyle v. Ford Motor Co., 399 N.J. Super. 18, 40 (App. Div.), certif. denied, 196 N.J. 597 (2008). Like the trial court, we "must accept as true all the evidence which supports the position of the non-moving party, according [that party] the benefit of all legitimate inferences." RSB Lab. Servs., Inc. v. BSI, Corp., 368 N.J. Super. 540, 555 (App. Div. 2004). If "reasonable minds could differ" on the result, "the motion must be denied." Smith v. Millville Rescue Squad, 225 N.J. 373, 397 (2016) (quoting Verdicchio v. Ricca, 179 N.J. 1, 30 (2004)).

"[T]he law of defamation exists to achieve the proper balance between protecting reputation and protecting free speech." DeAngelis v. Hill, 180 N.J. 1, 12 (2004) (quoting Ward, 136 N.J. at 528). The tort recognizes that people should be free to enjoy their reputations without suffering false and defamatory attacks. Turf Lawnmower Repair, Inc. v. Bergen Record Corp., 139 N.J. 392, 409 (1995), cert. denied, 516 U.S. 1066 (1996). As such, liability for defamation is imposed based upon publication of a false statement that injures the reputation of another. Salzano v. N. Jersey Media Grp., Inc., 201 N.J. 500, 512 (2010), cert. denied, 562 U.S. 1200 (2011).

To establish liability for defamation, a plaintiff must prove: "(1) that defendants made a false and defamatory statement concerning [the plaintiff]; (2) that the statement was communicated to another person (and not privileged); and (3) that defendants acted negligently or with actual malice." G.D. v. Kenny, 205 N.J. 275, 292-93 (2011). Malice must be established by clear and convincing evidence, whereas negligence carries a preponderance of the evidence burden. See Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 169 (1999).

Under the first prong, the question of whether "a statement is susceptible of a defamatory meaning is a question of law for the court." Ward, 136 N.J. at 529. In making this determination, we review a statement's content,

11

verifiability, and context to evaluate its susceptibility to a defamatory meaning. Ward, 136 N.J. at 529.

If the challenged language is ambiguous "in the sense of being reasonably subject to either an innocent or a defamatory meaning," it is for the factfinder to determine whether the language will be read in its defamatory sense. Herrmann v. Newark Morning Ledger Co., 48 N.J. Super. 420, 429-30 (App. Div. 1958); Sedore v. Recorder Pub. Co., 315 N.J. Super. 137, 145-46 (App. Div. 1998) ("The jury decides the question only when the trial court determines that 'the statement is reasonably susceptible to both a defamatory and a non-defamatory meaning.'" (quoting Molnar v. The Star–Ledger, 193 N.J. Super. 12, 18 (App. Div. 1984))); see also Restatement (Second) of Torts § 617(a) (Am. Law Inst. 1977) ("[Q]uestion of whether the defamatory imputations are true . . . is ordinarily for the jury.").

To analyze the content of a statement, courts consider the fair and natural meaning that the words would be given by persons of reasonable intelligence. DeAngelis v. Hill, 180 N.J. 1, 14 (2004). With respect to context, "courts must consider '[t]he listener's reasonable interpretation, which will be based in part on the context in which the statement appears.'" Id. at 15 (quoting Ward, 136 N.J. at 531).

Verifiability of the speech centers on whether the statement is one of fact or opinion. Id. at 14. That exercise, in turn, requires a court to consider whether a statement is true or false. Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 167 (1999). A factual statement can be proved or disproved objectively while an opinion statement generally cannot. Ibid. Statements of opinion are "not capable of proof of truth or falsity because they reflect a person's state of mind." NuWave Inv. Corp. v. Hyman Beck & Co., 432 N.J. Super. 539, 553 (App. Div. 2013) (quoting Ward, 136 N.J. at 531), aff'd, 221 N.J. 495 (2015). Thus, "[s]tatements of opinion, as a matter of constitutional law, enjoy absolute immunity." Dairy Stores, Inc. v. Sentinel Pub. Co., Inc., 104 N.J. 125, 147 (1986).

An opinion is actionable, however, if "it implies 'reasonably specific assertions' of 'underlying objective facts that are false.'" Ibid. (quoting Ward, 136 N.J. at 531). The more fact based the statement, the greater likelihood that it will be actionable. Ward, 136 at 531-32. "Loose, figurative or hyperbolic language is not likely to imply specific facts" and thus is generally not actionable. Lynch, 161 N.J. at 167–68. Similarly, "epithets, insults, name-calling, profanity and hyperbole" are not actionable. DeAngelis, 180 N.J. at 14.

In addition, as relevant here, "[t]he 'false attribution' of a quotation to a speaker may be defamatory if putting the words in the plaintiff's mouth 'cast[s]

doubt on the plaintiff's fitness for his profession.'" Chau v. Lewis, 771 F.3d 118, 131 (2d Cir. 2014) (quoting Mahoney v. Adirondack Publ'g Co., 517 N.E.2d 1365, 1368 (N.Y. 1987)); see also Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 511 (1991) ("[R]egardless of the truth or falsity of the factual matters asserted within the quoted statement, the attribution may result in injury to reputation because the manner of expression or even the fact that the statement was made indicates a negative personal trait or an attitude the speaker does not hold.").

Finally, we note that a statement can be "fairly accurate" and still be considered the truth as a defense to a defamation claim. G.D., 205 N.J. at 309-311. The law of defamation overlooks minor inaccuracies, focusing instead on "substantial truth." Ibid. (quoting Masson, 501 U.S. at 516). "Minor inaccuracies do not amount to falsity so long as 'the substance, the gist, the sting, of the libelous charge be justified.'" Ibid.

We affirm the court's June 14, 2021 order to the extent it dismissed plaintiff's complaint based upon defendant's comments that plaintiff erroneously prepared his 2016 returns. In granting defendant's motion, the trial judge determined plaintiff had not proved defendant's statements were defamatory, as the evidence established that the IRS required defendant to make amendments

14 <span>A-3391-20</span>

to his filed tax return, and defendant's belief that plaintiff was at fault was merely his opinion.

Specifically, the judge concluded that the 2016 tax returns "prepared . . . for defendant by [plaintiff]'s office . . . did . . . result in the IRS requiring corrections.  That's stipulated that it happened."  Plaintiff admitted defendant received an amended tax return after providing additional W-2 forms, and the court made an explicit finding that "corrections were necessary."  We are satisfied that the judge properly decided defendant's claim on this point, as "reasonable minds" would not differ on the result.  Smith, 225 N.J. at 397.  The trial evidence supported the court's finding that defendant's statements asserting that plaintiff's error required defendant to refile his 2016 taxes were not defamatory.[4]  We agree with the judge's determination that the statement accusing plaintiff of "mess[ing] up" the tax filings was merely defendant's opinion of the matter.

We reach a different conclusion with respect to the second group of statements in defendant's posts, which accused plaintiff of sending insulting text

---

[4]  We are also satisfied that any mistake as to the referenced year of the refiled tax returns does not undermine the judge's finding as to the statement's veracity, as it is a "minor inaccuracy," see G.D., 205 N.J. at 309-311, and has no effect on the fact that the IRS required defendant to pay additional taxes due to the omitted W-2 forms, to which plaintiff admitted.

messages "laced with curses" and attributed various inflammatory statements to plaintiff. The court did not make any findings as to these statements. As is evident from the texts, however, the messages plaintiff sent to defendant do not contain any curses and did not call plaintiff any disparaging names. Rather, plaintiff merely wrote to defendant that "if [I] were in my younger days I w[ould] curse [you] ou[t] very badly." Further, the postings attribute direct quotations to plaintiff that are not contained in the text messages, including the alleged statement that defendant was "only leaving to commit fraud."

As such, we remand for the court to make findings regarding the defamatory nature of these statements as applied against the liberal standard under Rule 4:40, and depending on the court's determination, proceed as appropriate with the remanded proceedings. In reaching its conclusion, the court should be mindful that the "'false attribution' of a quotation to a speaker may be defamatory" when it "casts doubt on plaintiff's fitness for his profession.'" Chau, 771 F.3d at 131.

II.

For purposes of completeness, we also address plaintiff's argument with respect to the actual-malice standard. As noted, plaintiff contends the judge erroneously applied the actual-malice standard, applicable for matters of public

concern, rather than the ordinary negligence standard, applicable for a private plaintiff in matters of private concern. Specifically, plaintiff contends that because the parties are private individuals,[5] and "the statements did not concern public policy, health or safety, and do not advance the public's interest," the negligence standard should apply. Defendant argues the matter relates to a public concern because plaintiff is a certified public accountant licensed by the State and his dealings with individual taxpayers "affect[s] the community as a whole."

We agree with plaintiff that defendant's statements do not involve a matter of public concern and, as such, his liability for any statements deemed to be defamatory in nature should be evaluated under a negligence standard. We note, however, that no error arose out of the judge's application of the actual malice standard with respect to matters of public concern, as he decided the motion based upon the threshold finding that defendant's statements about his 2016 tax returns were opinion speech, and therefore not actionable.

Two standards exist to determine liability in defamation cases. Where the subject speech "touch[es] on matters of public concern and interest" courts apply

_____

[5] Private citizens are those who do not voluntarily thrust themselves into the public limelight. Turf Lawnmower, 139 N.J. at 412.

the "actual-malice standard." Durando v. Nutley Sun, 209 N.J. 235, 247 (2012); see also Senna v. Florimont, 196 N.J. 469, 474 (2008) ("we give greater protection to speech involving public officials, public figures, and the public interest"). That is so because "speech involving matters of public interest and concern needs adequate breathing room in a democratic society." Senna, 196 N.J. at 491 (citing New York Times Co. v. Sullivan, 376 U.S. 254, 271-72, (1964)). Actual malice exists where "the speaker made a false and defamatory statement either knowing it was false or in reckless disregard of the truth" and "must be proven by 'clear and convincing evidence.'" Id. at 474, 483 n.8 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)).

On the other hand, where the subject speech "does not involve matters of public concern" courts apply a negligence standard. Id. at 491. This is so because "[s]peech that does not involve matters of public concern requires that greater weight be placed on an individual's interest in an unimpaired reputation." Ibid. The negligence standard requires a plaintiff to prove "that the speaker acted negligently in failing to ascertain the truth of the statement" by a "preponderance of the evidence." Id. at 474, 491 n.16.

In determining whether "speech involves a matter of public concern or interest that will trigger the actual-malice standard" courts "should consider the

content, form, and context of the speech." Id. at 497. "Content requires that [courts] look at the nature and importance of the speech." W.J.A. v. D.A., 210 N.J. 229, 244 (2012). "Context requires that [courts] look at the identity of the speaker, his ability to exercise due care, and the identity of the targeted audience." Ibid.

In Senna, the operator of a boardwalk game broadcasted messages over a loudspeaker stating that a nearby competitor was "dishonest," and "a crook," and "screwed all of his customers" by not redeeming prize tickets. 196 N.J. at 476. Our Supreme Court held that such speech "impugning the honesty of a business competitor" was not entitled to the heightened protection of the actual-malice standard. Id. at 474. The Court rejected the argument that the speech should be subject to the higher standard because it constituted an accusation of consumer fraud. Id. at 499. In doing so, the Court reasoned that "the identity of the speaker is an important factor" explaining that the "[d]efendant's employees were basically scaring customers away from [the] plaintiff," which it concluded was distinguishable from "disinterested investigative reporting by a newspaper, using a variety of sources, to demonstrate that customers were being defrauded by a service-oriented business," which would be entitled to greater protection. Ibid.

19

The Court also rejected the argument that the speech was a matter of public concern and entitled to the protection of an actual-malice standard because defendant's business was "highly regulated." Id. at 499-500. It explained that speech does not involve a matter of public interest merely because it concerns a highly regulated industry. Id. at 500. It provided as an example that "when one accountant wrongly and falsely accuses another accountant of overcharging clients, and disseminates those accusations to clients, the public interest is not served by shielding the speaker from the consequences of his negligence." Id. at 500.

In sum, the Court concluded that there was no "significant public benefit in giving business rivals greater protection for the false and defamatory speech they use as an economic club to harm each other." Id. at 496. It explained "[b]usinesses have an obligation to act with due care before calling the services rendered by a rival crooked or fraudulent" and noted that "no business owner will ever be liable for the truth he tells about a rival." Id. at 496, 499.

In W.J.A., the Court relied on Senna in determining that a website the defendant created accusing the plaintiff, his uncle, of sexually abusing him as a child did not "implicate[] the public interest." 210 N.J. at 246. It reasoned that the speech consisted of "a personal and subjective belief" about "an essentially

private dispute." Id. at 245-46. Further, the Court stated that the defendant's "desire to publish the Internet statements to the entire country" did not "necessarily make his allegations a matter of public interest." Ibid.

Here, we are satisfied that the "content, form, and context of [defendant's] speech" indicate that it did not involve a matter of public concern. Senna, 196 N.J. at 497. As noted, defendant's Facebook and Yelp postings accused plaintiff of "mess[ing] up [his] tax returns," and insulting and cursing at him. Those claims relate to isolated incidents between private individuals and, as such, are of limited concern to the public. See W.J.A., 210 N.J. at 245-46. That defendant published statements about his private dispute with plaintiff on the Internet does not transform the nature of his speech into a matter of public concern. Ibid.

Defendant's identity as a disgruntled former client further supports that his speech was not a matter of public concern. Defendant is not akin to a disinterested reporter "using a variety of sources[] to demonstrate that customers were being defrauded by" plaintiff, but rather was effectively attempting to "scar[e] customers away from plaintiff." Senna, 196 N.J. at 499. Finally, contrary to defendant's contentions, we are not persuaded that plaintiff's status as a certified public accountant regulated by the State elevates defendant's speech to a matter of public concern. Id. at 500.

A-3391-20

In sum, we conclude that defendant's Internet postings did not involve a matter of public concern and, therefore, do not qualify for the heightened protections of the actual-malice standard. As such, if the court determines any of defendant's statements were of a defamatory nature, it should apply a negligence standard in evaluating defendant's liability.

To the extent we have not specifically addressed any of plaintiff's arguments, it is because we conclude they are of insufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Reversed in part and remanded to the trial court for further proceedings in accordance with this opinion. Nothing in our opinion should be interpreted as an expression of our view on the outcome of the remanded proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION