958 A.2d 427

RANDY SENNA, T/A FLIPPERS FASCINATION, PLAINTIFF–APPELLANT, v. WALTER FLORIMONT AND 2400 AMUSEMENTS, INC., T/A OLYMPIC ENTERPRISES, DEFENDANTS–RESPONDENTS, AND ROBERT MEHLBAUM AND JOHN DOE A & JOHN DOE B, DEFENDANTS.

Argued February 20, 2008—Decided September 22, 2008.

*Scott E. Becker* argued the cause for appellant.

*Frank L. Corrado* argued the cause for respondents (*Barry, Corrado, Grassi & Gibson,* attorneys).

*Thomas J. Cafferty* submitted a brief on behalf of *amicus curiae* New Jersey Press Association (*Scarinci & Hollenbeck,* attorneys; *Mr. Cafferty* and *Nomi I. Lowy,* on the brief).

Justice ALBIN delivered the opinion of the Court.

In this case, we once again address the degree to which speech, even speech that may disseminate falsehoods damaging the reputation of a person, should be protected from a defamation lawsuit. Balancing the right to speak freely and the right to be secure in

one's good name—determining how much protection should be given to speech at the expense of reputation—is at the heart of this case.

In a general defamation case, a plaintiff claiming to be damaged by a false statement will succeed if he shows that the speaker acted negligently in failing to ascertain the truth of the statement. However, we give greater protection to speech involving public officials, public figures, and the public interest because of the important role that uninhibited and robust debate plays in our democratic society. In those cases, the plaintiff must prove actual malice, showing that the speaker made a false and defamatory statement either knowing it was false or in reckless disregard of the truth. The actual-malice standard tolerates more falsehood and harm to reputation than the negligence standard in order to shield highly valued speech from ruinous lawsuits.

The issue on appeal is whether defendant Walter Florimont, an operator of a boardwalk game of chance, whose employees broadcast over a loudspeaker that a nearby boardwalk competitor, plaintiff Randy Senna, was a cheat, is entitled to the heightened protection of the actual-malice standard. The trial court dismissed plaintiff's defamation lawsuit on summary judgment, finding first that the actual-malice standard applied because games of chance, as a highly regulated industry, are a matter of public concern, and second that plaintiff could not prove actual malice. The Appellate Division affirmed. We now reverse and hold that the false and defamatory verbal broadsides of defendant's employees, impugning the honesty of a business competitor, fall into the category of commercial speech that is not entitled to heightened protection under the actual-malice standard.

I.

A.

In 2003, plaintiff Senna owned Flipper's Fascination, an arcade game on the boardwalk in Wildwood. His rival, defendant

Florimont, owned defendant 2400 Amusements, Inc., trading as Olympic Enterprises, located nearby on the boardwalk in North Wildwood.[1] Fascination is a competitive game of chance regulated by the State's Legalized Games of Chance Control Commission. The first player to roll balls into five holes that form a vertical, horizontal, or diagonal row wins the game and receives tickets that can be redeemed for prizes. *See Ruben v. Keuper*, 43 *N.J.Super.* 128, 131, 127 *A.*2d 906 (Ch.Div.1956) (describing game of Fascination).

Senna operated a Fascination parlor in Keansburg from the late 1970s through 1984 and one in Seaside Heights from 1987 to 1995. While looking for a new site for his business, Senna spoke with Florimont, who recommended that he locate his Fascination parlor in Rehoboth Beach, Delaware. Instead, in 1996, Senna decided to open his Fascination arcade in Wildwood, placing him in direct competition with Florimont. Florimont told Senna that "[t]his is my town" and "I'm going to run you out of business." Senna remained undeterred.

To keep his client base, Senna ran an "almost full-page ad" in the *Asbury Park Press* in which he promised that prize tickets won at his Seaside Heights parlor would be honored at the new Wildwood location. Soon afterwards, Senna was informed that staff members at Florimont's Olympic Fascination were telling Olympic's boardwalk customers that Senna would not honor the prize tickets that he had issued. Senna asked Florimont to restrain his employees from "bad-mouth[ing]" him and his business with false and derogatory comments. According to Senna, however, Florimont's employees continued to verbally assail his business. Within a few months, Senna closed down his Wildwood Fascination parlor, only to resurrect it in 2000 under the name of Flipper's Fascination.

---

[1] Because summary judgment was granted in favor of defendants and on their motion, we present the facts, as we must, in the light most favorable to plaintiff, who was the non-moving party. *See Brill v. Guardian Life Ins. Co. of Am.*, 142 *N.J.* 520, 540, 666 *A.*2d 146 (1995).

On dates in July, August, and September 2003, Florimont's employees broadcast over a public address system to his boardwalk customers that Flipper's Fascination and its owner, Senna, were flimflamming the public. Florimont's employees called Senna "dishonest" and "a crook," charging that he " 'ran away and screwed all of his customers in Seaside.' " As they had done several years earlier, Florimont's employees specifically accused Senna of having left his Seaside Heights customers with worthless prize tickets—tickets that he would not honor in Wildwood—and warned that he would cheat his customers again.

### B.

In March 2004, plaintiff Senna filed a civil complaint in the Law Division, Cape May County, alleging that defendants Florimont and 2400 Amusements, as well as Robert Mehlbaum and two John Does, defamed him and tortiously interfered with his ability to conduct business as Flipper's Fascination.[2] The claim against Mehlbaum was based on an alleged Internet posting in which he accused Senna of running a fraudulent operation by "cheating patron[s] out of prizes" and "overcharging for prizes."[3] Plaintiff demanded compensatory and punitive damages.

The trial court granted summary judgment in favor of defendants, dismissing both the tortious interference and defamation claims. First, the court noted that plaintiff had not provided any evidence that he had suffered actual economic damages—an element necessary to sustain the tortious interference claims. Second, to succeed on the defamation claims, the court maintained

---

[2] This civil action is denominated as Senna's second amended complaint. The court dismissed without prejudice Senna's first complaint, filed in October 2003, for failure to set forth particularized factual allegations supporting his defamation and tortious interference claims.

[3] There is no indication in the record that Mehlbaum answered the complaint or participated in discovery or any court proceeding, or that the John Does were ever identified and named as parties. For our purposes, we use the term defendants to refer only to Florimont and 2400 Amusements.

that plaintiff had to show that defendants acted with actual malice. The standard of actual malice requires proof that defendants made the allegedly defamatory statements either knowing that they were false or in reckless disregard of the truth. The court applied that heightened standard because the speech alleged to be defamatory concerned " 'a highly regulated industry' " and " 'a matter of legitimate public concern' "—games of chance. (Quoting *Turf Lawnmower Repair, Inc. v. Bergen Record Corp.*, 139 *N.J.* 392, 410, 655 *A.*2d 417 (1995), *cert. denied,* 516 *U.S.* 1066, 116 *S.Ct.* 752, 133 *L.Ed.*2d 700 (1996)). The court concluded that sufficient evidence had not been presented to show that Florimont or his employees acted with actual malice in defaming plaintiff.

## C.

In an unpublished, per curiam opinion, the Appellate Division affirmed the summary judgment dismissal of plaintiff's claims. Relying on *Turf Lawnmower,* the panel concluded that boardwalk games of chance, such as Fascination, are part of a "highly-regulated industry" and therefore critical commentary about the operation of such games is subject to the actual-malice standard. The panel observed that arcade games of chance are a form of gambling governed by "seventy separate regulations" administered by the State's Legalized Games of Chance Control Commission. The regulations specifically prohibit the operators of Fascination parlors from placing time limits on the redemption of prize tickets, *N.J.A.C.* 13:3–3.5(b)(1), and from engaging in "deceptive" or "fraudulent" practices, *N.J.A.C.* 13:3–3.8(a). The appellate panel therefore determined that the actual-malice standard applied to those statements allegedly made by defendants' employees over the public address system, accusing plaintiff of swindling customers by not allowing them to redeem prize tickets won at his defunct Seaside Heights Fascination parlor.

We granted plaintiff's petition for certification. 192 *N.J.* 477, 932 *A.*2d 28 (2007). We also granted the New Jersey Press Association's motion to participate as amicus curiae.

## II.

The central issue in this case is whether the bellowing of a boardwalk barker over a public address system, accusing his employer's competitor of engaging in deceit and chicanery, should be speech protected by the actual-malice standard.

Plaintiff essentially argues that when one business uses speech that is false and defamatory to undermine a competitor's good name and standing for apparent financial advantage, the negligence standard represents the proper balance between the interests in promoting free speech and preserving reputation. Plaintiff sees no significant public interest in heightening the protection of defamatory speech that one business owner uses to bludgeon another in the competition of the marketplace. Alternatively, plaintiff submits that his proofs satisfied the actual-malice standard and therefore the Appellate Division erred in affirming the dismissal of his claims.

Defendants and amicus New Jersey Press Association claim that the defamatory speech in this case is protected by the actual-malice standard because plaintiff's operation of his Fascination parlor "'intrinsically implicate[s] important public interests.'" (Quoting *Turf Lawnmower, supra,* 139 *N.J.* at 411, 655 *A.*2d 417). That is so, they argue, because defendants' speech questioned the integrity of the operation of a game of chance, Fascination, which is part of a "highly regulated industry," and because the speech included allegations that plaintiff committed consumer fraud and violated administrative regulations—matters of public concern identified in *Turf Lawnmower, supra. See* 139 *N.J.* at 410, 413, 655 *A.*2d 417.

Defendants urge that we not create "a competitor's exception or commercial exception" to the actual-malice standard or distinguish between media and non-media defendants. Amicus also maintains that individual citizens should receive the same heightened protections as the press—that is, there should be no preferential treatment—when speech touches on issues of public concern or interest. Last, both defendants and amicus urge that we affirm the

dismissal of plaintiff's claims based on an absence of proof of actual malice.

## III.

In this case, we must balance two competing interests—the right of individuals "to enjoy their reputations unimpaired by false and defamatory attacks," and the right of individuals to speak freely and fearlessly on issues of public concern in our participatory democracy. *Swede v. Passaic Daily News*, 30 *N.J.* 320, 331, 153 *A.*2d 36 (1959). To better understand where that balance must be struck in the circumstances before us, we briefly survey the law of defamation from its common law origins to the present day. We begin by reviewing the importance society placed on reputation in the development of defamation law.

## A.

The common law principle that "[e]very man has a right to his good name, unimpaired," *Leers v. Green*, 24 *N.J.* 239, 251, 131 *A.*2d 781 (1957), finds its source in our belief in " 'the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty,' " *Lynch v. N.J. Educ. Ass'n*, 161 *N.J.* 152, 166, 735 *A.*2d 1129 (1999) (quoting *Rosenblatt v. Baer*, 383 *U.S.* 75, 92, 86 *S.Ct.* 669, 679, 15 *L.Ed.*2d 597, 609 (1966) (Stewart, J., concurring)). Reputation was valued so highly at common law that a speaker or writer was held liable for the publication of a false and defamatory statement regardless of fault. *Dairy Stores, Inc. v. Sentinel Publ'g Co.*, 104 *N.J.* 125, 136, 516 *A.*2d 220 (1986) (citing *Prosser & Keeton on Torts* § 113, at 804 (5th ed.1984)). It made no difference that the speaker may have uttered the words believing them to be true and obtained the information from reliable sources; if the speech was false, the speaker was strictly liable for the harm done to another's reputation. *Ibid.; see also Peck v. Tribune Co.*, 214 *U.S.* 185, 189, 29 *S.Ct.* 554, 555, 53 *L.Ed.* 960, 962 (1909) (" 'Whenever a man publishes, he publishes at his peril.' " (quoting *The King v. Wood-*

*fall,* 98 *Eng. Rep.* 914, 916 (K.B.1774))). Because every person was presumed to enjoy a good reputation, a defamatory statement was presumed to be false, and the speaker had the burden of proving the truth of the challenged statement.[4] *Prosser & Keeton, supra,* § 116, at 839.

The right to enjoy one's reputation free from unjustified smears and aspersions was considered not only an essential element of personal security, *see* William Blackstone, 3 *Commentaries* \*128, but so socially significant that the right "was understood to be guaranteed by Article I, paragraph 1 of the [New Jersey] Constitution of 1844," *Doe v. Poritz,* 142 *N.J.* 1, 104, 662 *A.*2d 367 (1995). Under that constitutional provision, which is almost identical to the language of Article I, Paragraph 1 of the 1947 Constitution, " '[t]he right of a person to be secure in his reputation against unwarranted attacks such as slanders and libels is a part of the right of enjoying life and pursuing and obtaining safety and happiness.' "[5] *Neafie v. Hoboken Printing & Publ'g Co.,* 75 *N.J.L.* 564, 567, 68 *A.* 146 (E. & A.1907) (citing *N.J. Const. of 1844* art. I, ¶ 1), *quoted in Doe, supra,* 142 *N.J.* at 104–05, 662 *A.*2d 367.

Although New Jersey's 1844 Constitution enshrined free speech as a fundamental right and forbade the state from imposing prior restraints on speech, it also allowed for persons to be held accountable for the utterance of false and defamatory statements. Article I, Paragraph 5 provided that "[e]very person may freely speak, write and publish his sentiments on all subjects, *being*

---

[4] In the eighteenth and early nineteenth centuries, the ability to seek legal recourse through a defamation suit to vindicate one's honor provided a civilized alternative to deadly duels. *See* Clayton E. Cramer, *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* 55–56 (1999) (discussing link between defamation law and duels).

[5] Article I, Paragraph 1 of the 1947 State Constitution reads: "All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness." *Cf. N.J. Const. of 1844* art. I, ¶ 1.

*responsible for the abuse of that right.* No law shall be passed to restrain or abridge the liberty of speech or of the press." [6] *N.J. Const. of 1844* art. I, ¶ 5 (emphasis added). Thus, our State Constitution implicitly acknowledged the common law of defamation as a remedy for those who "abuse[d]" the right to speak and write freely. *See Neafie, supra,* 75 *N.J.L.* at 567, 68 *A.* 146 ("[T]he people of this state, who ordained the constitution, have not empowered the legislative body to authorize a newspaper publisher or any other citizen to unjustifiably injure his neighbor's reputation without making compensation for that injury.").

The common law of strict liability in defamation cases, however, was buffered by a limited number of absolute and qualified privileges, which were " 'designed to protect speech in those narrowly defined instances in which the public interest in unrestrained communication outweighs the right of redress.' " [7] *Costello v. Ocean County Observer,* 136 *N.J.* 594, 606, 643 *A.*2d 1012 (1994) (quoting *Fees v. Trow,* 105 *N.J.* 330, 336, 521 *A.*2d 824 (1987)). Those privileges, which protect speech serving important public interests, and the growing recognition in the twentieth

---

[6] That language was taken, almost verbatim, from New York's 1821 Constitution, *see N.Y. Const. of 1821* art. VII, § 8, and retained by the drafters of our current Constitution, *see N.J. Const.* art. I, ¶ 6. *See also Drake v. State,* 53 *N.J.L.* 23, 26, 20 *A.* 747 (Sup.Ct.1890) (discussing history of *N.J. Const. of 1844* art. I, ¶ 5); Committee on Rights, Privileges, Amendments and Miscellaneous Provisions, *Report and Proposal, in* 2 *State of New Jersey, Constitutional Convention of 1947,* at 1022, 1023 (Sidney Goldmann & Herman Crystal eds., 1951); *Proceedings of the New Jersey State Constitutional Convention of 1844,* at 144 (N.J. Writers' Project, Work Projects Admin. ed., 1942).

[7] Absolute privileges completely immunize statements "made in judicial, legislative, or administrative proceedings." *Dairy Stores, supra,* 104 *N.J.* at 136, 516 *A.*2d 220. Qualified privileges provide protection for speech so long as the speaker does not abuse the privilege, such as by speaking "with an improper purpose or ill will." *Ibid.* Examples of qualified privileges are when people "make statements to authorities for the prevention and detection of crime," and when the press reports on statements made at government meetings. *Id.* at 136–37, 516 *A.*2d 220.

century of the importance of free speech—unrestrained by government punishment or censorship—provided the intellectual backdrop for the dramatic change in defamation law brought about by the United States Supreme Court in *New York Times Co. v. Sullivan*, 376 *U.S.* 254, 84 *S.Ct.* 710, 11 *L.Ed.*2d 686 (1964).

We now turn to that case and its progeny, which identified categories of speech in need of greater protection than that afforded by the common law of defamation.

### B.

In *New York Times*, the Supreme Court held that the First Amendment's guarantee of freedom of speech and freedom of the press limits a state court's "power to award damages for libel in actions brought by public officials against critics of their official conduct." *Id.* at 283, 84 *S.Ct.* at 727, 11 *L.Ed.*2d at 708. At issue was a full-page advertisement published in the March 29, 1960 edition of the *New York Times* decrying the violent suppression of peaceful civil rights protests in the South, particularly in Montgomery, Alabama. *Id.* at 256–58, 84 *S.Ct.* at 713–14, 11 *L.Ed.*2d at 692–94. In response to the advertisement, the Montgomery police commissioner, L.B. Sullivan, filed a libel suit against the *New York Times* and four black clergymen in an Alabama state court, claiming that the advertisement's references to actions by the Montgomery police damaged his reputation. *Ibid.* The Alabama Supreme Court upheld a jury verdict against the *New York Times* and the clergymen awarding Sullivan damages in the amount of $500,000. *Id.* at 256, 84 *S.Ct.* at 713, 11 *L.Ed.*2d at 692.

The United States Supreme Court, in an opinion written by Justice Brennan, reversed, holding that the First Amendment "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was

false or not." [8] *Id.* at 279–80, 292, 84 *S.Ct.* at 726, 733, 11 *L.Ed.*2d at 706, 714. The Court considered the case "against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* at 270, 84 *S.Ct.* at 721, 11 *L.Ed.*2d at 701. It viewed the "advertisement[ ] as an expression of grievance and protest on one of the major public issues of [the] time." *Id.* at 271, 84 *S.Ct.* at 721, 11 *L.Ed.*2d at 701. The application of Alabama's defamation law was constitutionally intolerable because libel suits threatened to bankrupt newspapers like the *New York Times* and therefore "dampen[ ] the vigor and limit[ ] the variety of public debate," even discouraging truthful speech out of "fear of the expense" of defending against such suits. *Id.* at 277–79, 84 *S.Ct.* at 724–26, 11 *L.Ed.*2d at 705–06.

■ Following *New York Times*, the United States Supreme Court extended the actual-malice standard to give greater protection to speech concerning public figures.[9] *Curtis Publ'g Co. v. Butts*, 388 *U.S.* 130, 162–65, 87 *S.Ct.* 1975, 1995–96, 18 *L.Ed.*2d 1094, 1115–17 (1967) (Warren, C.J., concurring).[10] The Court

---

[8] The Court later clarified that actual malice must be proven by "clear and convincing evidence," and that a trial court should consider that evidentiary standard when ruling on a summary judgment motion. *Anderson v. Liberty Lobby, Inc.*, 477 *U.S.* 242, 255–56, 106 *S.Ct.* 2505, 2514, 91 *L.Ed.*2d 202, 216 (1986); *see also Costello, supra*, 136 *N.J.* at 614, 643 *A.*2d 1012.

[9] A person is a public figure for all purposes when he has achieved "pervasive fame or notoriety" or for limited purposes when he "voluntarily injects himself or is drawn into a particular public controversy." *Gertz v. Robert Welch, Inc.*, 418 *U.S.* 323, 351, 94 *S.Ct.* 2997, 3012–13, 41 *L.Ed.*2d 789, 812 (1974).

[10] Chief Justice Warren's view that the actual-malice standard should apply to public figures was endorsed by a majority of the Court in that case, *see Curtis Publ'g, supra*, 388 *U.S.* at 170, 87 *S.Ct.* at 1999, 18 *L.Ed.*2d at 1120 (Black, J., joined by Douglas, J., concurring in part, dissenting in part); *id.* at 172, 87 *S.Ct.* at 2000, 18 *L.Ed.*2d at 1121 (Brennan, J., joined by White, J., concurring in part,

recognized that unlike private individuals, "[p]ublic officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements." *Gertz v. Robert Welch, Inc.,* 418 *U.S.* 323, 344, 94 *S.Ct.* 2997, 3009, 41 *L.Ed.*2d 789, 808 (1974).

In *Rosenbloom v. Metromedia, Inc.,* 403 *U.S.* 29, 91 *S.Ct.* 1811, 29 *L.Ed.*2d 296 (1971), a plurality of the Court extended the actual-malice standard to protect speakers who discuss *"matters of public or general concern,"* even when the person claiming to be defamed is a private figure. *Id.* at 43–44, 91 *S.Ct.* at 1820, 29 *L.Ed.*2d at 312 (Brennan, J., plurality opinion) (emphasis added). However, in *Gertz, supra,* the Court rejected the plurality's approach in *Rosenbloom* and held that, for First Amendment purposes, the actual-malice standard does not apply when private individuals seek redress for "injury inflicted by defamatory falsehood." 418 *U.S.* at 345–46, 94 *S.Ct.* at 3010, 41 *L.Ed.*2d at 808–09.

The Court in *Gertz* observed that private individuals, unlike public officials or public figures, have not "voluntarily exposed themselves to increased risk of injury from defamatory falsehood" or "relinquished [any] part of [their] interest in the protection of [their] own good name[s]." *Id.* at 345, 94 *S.Ct.* at 3010, 41 *L.Ed.*2d at 808. For those reasons, the Court considered private individuals "more vulnerable to injury . . . [and] also more deserving of recovery." *Ibid.* Although the Court held that, at least with respect to media defendants, states could "not impose liability without fault," it left to the states "substantial latitude" to develop their own "legal remedy for defamatory falsehood injurious to the reputation of a private individual." *Id.* at 332, 345–47, 94 *S.Ct.* at 3003, 3010, 41 *L.Ed.*2d at 801, 809.

Unlike most states, New Jersey accepted the invitation to provide greater protection to speech involving matters of public

---

dissenting in part), and has been followed ever since, *see, e.g., Lynch, supra,* 161 *N.J.* at 165, 169–70, 735 *A.2d* 1129.

concern than mandated by the United States Supreme Court's First Amendment jurisprudence.[11] *See* 1 *Sack on Defamation* §§ 6.2 to 6.3 (3d ed. 1999 & Supp. VIII 2007). We now turn to the trilogy of New Jersey Supreme Court cases that rejected the negligence standard in favor of the actual-malice standard in private-figure defamation cases in which the challenged speech touches on matters of public concern.

## C.

■ In three seminal cases involving media and media-related defendants, this Court expanded free speech protections under our common law—beyond the mandate of federal law—and applied the actual-malice standard to investigative news stories that addressed

---

[11] To date, most states have declined to go as far as the *Rosenbloom* plurality, which would have imposed the actual—malice standard on defamation actions involving private—figure plaintiffs when speech touches on matters of public concern. *See Rosenbloom, supra,* 403 *U.S.* at 43–44, 91 *S.Ct.* at 1820, 29 *L.Ed.2d* at 312 (Brennan, J., plurality opinion). In such cases, those states employ the negligence standard. *See, e.g., Brown v. Kelly Broad. Co.,* 48 *Cal.3d* 711, 257 *Cal.Rptr.* 708, 771 *P.2d* 406, 425 (1989); *Miami Herald Publ'g Co. v. Ane,* 458 *So.2d* 239, 241–42 (Fla.1984); *Cahill v. Hawaiian Paradise Park Corp.,* 56 *Haw.* 522, 543 *P.2d* 1356, 1366 (1975); *Wiemer v. Rankin,* 117 *Idaho* 566, 790 *P.2d* 347, 354–55 (1990); *Troman v. Wood,* 62 *Ill.2d* 184, 340 *N.E.2d* 292, 299 (1975); *Jones v. Palmer Commc'ns Inc.,* 440 *N.W.2d* 884, 898 (Iowa 1989), *overruled on other grounds by Schlegel v. Ottumwa Courier,* 585 *N.W.2d* 217, 224 (Iowa 1998); *Gobin v. Globe Publ'g Co.,* 216 *Kan.* 223, 531 *P.2d* 76, 83–84 (1975); *McCall v. Courier–Journal & Louisville Times Co.,* 623 *S.W.2d* 882, 886 (Ky.1981), *cert. denied,* 456 *U.S.* 975, 102 *S.Ct.* 2239, 72 *L.Ed.2d* 849 (1982); *Stone v. Essex County Newspapers, Inc.,* 367 *Mass.* 849, 330 *N.E.2d* 161, 164 (1975); *Rouch v. Enquirer & News of Battle Creek, Mich.,* 427 *Mich.* 157, 398 *N.W.2d* 245, 259–62 (1986); *Neill Grading & Constr. Co., Inc. v. Lingafelt,* 168 *N.C.App.* 36, 606 *S.E.2d* 734, 741, *appeal granted,* 359 *N.C.* 635, 616 *S.E.2d* 541(N.C), *appeal dismissed,* 360 *N.C.* 172, 622 *S.E.2d* 490 (2005); *Lansdowne v. Beacon Journal Publ'g Co.,* 32 *Ohio St.3d* 176, 512 *N.E.2d* 979, 983–84 (1987); *Martin v. Griffin Television, Inc.,* 549 *P.2d* 85, 92 (Okla.1976); *Foster v. Laredo Newspapers, Inc.,* 541 *S.W.2d* 809, 819 (Tex.1976), *cert. denied,* 429 *U.S.* 1123, 97 *S.Ct.* 1160, 51 *L.Ed.2d* 573 (1977); *Gazette, Inc. v. Harris,* 229 *Va.* 1, 325 *S.E.2d* 713, 724–25, *cert. denied,* 472 *U.S.* 1032, 105 *S.Ct.* 3513, 87 *L.Ed.2d* 643, and 473 *U.S.* 905, 105 *S.Ct.* 3528, 87 *L.Ed.2d* 653 (1985); *Denny v. Mertz,* 106 *Wis.2d* 636, 318 *N.W.2d* 141, 148–50, *cert. denied,* 459 *U.S.* 883, 103 *S.Ct.* 179, 74 *L.Ed.2d* 147 (1982).

matters of public concern. In *Dairy Stores, Inc. v. Sentinel Publishing Co., supra,* two weekly newspapers owned by the defendant, Sentinel Publishing Co., Inc. (Sentinel), published an article reporting that the plaintiff, Krauszer's convenience stores, was selling spring water contaminated with chlorine. 104 *N.J.* at 129–31, 516 *A.2d* 220. Krauszer's filed a defamation claim against Sentinel and the reporter responsible for the story and a tortious interference claim (treated by the Law Division as a defamation claim) against the laboratory that analyzed the water for the newspapers' story. *Id.* at 131, 516 *A.2d* 220.. Applying the actual-malice standard based on our state law's fair comment privilege, we affirmed the grant of summary judgment in favor of Sentinel, the reporter, and the laboratory.[12] *Id.* at 129, 516 *A.2d* 220.

 Although the United States Supreme Court had withdrawn full First Amendment protection for speech involving matters of public interest in *Gertz,* we found that that such speech is sheltered under our common law privilege of fair comment. *Id.* at 140–41, 516 *A.2d* 220. We recognized that "[t]he need for the free flow of information and commentary on matters of legitimate public concern" required heightened protection for the speaker, regardless of whether the target of the speech was a public official or public figure. *Id.* at 148, 516 *A.2d* 220. To overcome the fair comment privilege on a matter of public concern, therefore, "a plaintiff must establish that the publisher knew the statement to be false or acted in reckless disregard of its truth or falsity." *Id.* at 151, 516 *A.2d* 220. We extended the actual-malice standard not only to the media defendants in *Dairy Stores,* but also to the independent laboratory retained by Sentinel because "outside experts that conduct tests and submit reports to the media are so

---

[12] Generally, the fair comment privilege provides a defense to a libel or slander action when "the words in question are fair comment on a matter of public interest or concern." *Leers, supra,* 24 *N.J.* at 253, 131 *A.2d* 781. A speaker, however, loses the protection of the privilege if he uses his criticism "for personal imputations not arising out of the subject-matter or not based on fact." *Id.* at 254–55, 131 *A.2d* 781 (quotation omitted).

closely related to news gathering that they should be treated like media defendants." *Id.* at 154, 516 *A.*2d 220. We determined that to hold the outside expert to a negligence standard of care would have a chilling effect on the media's ability to prepare and disseminate a story that is in the public interest.[13] *Ibid.*

In *Sisler v. Gannett Co.,* 104 *N.J.* 256, 516 *A.*2d 1083 (1986), decided the same day as *Dairy Stores,* we again relied on our state common law to extend the actual-malice standard to protect a story published in a newspaper. *Id.* at 260, 279, 516 *A.*2d 1083. There, the *Courier–News* reported that a retired bank president, Mayo Sisler, had received an under-collateralized loan from his former bank to finance his horse farm, and that federal and state authorities were investigating the bank concerning "questionable loans."[14] *Id.* at 259–60, 516 *A.*2d 1083. The article clearly suggested that Sisler improperly benefited from insider dealing. *See id.* at 260, 275, 516 *A.*2d 1083. Sisler filed a defamation action against the newspaper, its parent company, and the staff writer who prepared the article. *Id.* at 261, 516 *A.*2d 1083.

We acknowledged that the former bank official was neither a public official nor a public figure for First Amendment purposes. *Id.* at 269–70, 516 *A.*2d 1083. Nevertheless, we determined that "the propriety of substantial loans issued by an area bank to its former-president and founder is a topic of legitimate public interest," and that "[t]he press thus has an important function not only in reporting government activity respecting banking but also in informing the public about bank conduct." *Id.* at 268–69, 516 *A.*2d 1083. As in *Dairy Stores,* we concluded that our state common law provides greater protection to speech relating to matters of

---

[13] In *Dairy Stores, supra,* the broad language we used stating that "the actual malice standard should apply to non-media as well as to media defendants" was tempered by the actual holding, which was limited to a media-related defendant, such as an expert, who assists in the preparation of a public-interest article. 104 *N.J.* at 153, 516 *A.*2d 220.

[14] The article was inaccurate. In truth, Sisler "had adequately secured his loans." *Sisler, supra,* 104 *N.J.* at 260, 516 *A.*2d 1083.

legitimate public interest than the Federal Constitution. *Id.* at 271–76, 516 *A.*2d 1083. Because Sisler "voluntarily and knowingly engaged in conduct that [he] should reasonably [have] know[n] would implicate a legitimate public interest, engendering the real possibility of public attention and scrutiny," *id.* at 274, 516 *A.*2d 1083, we determined that he was required to show that the news story was not only false, but was issued " 'with knowledge that it was false or with reckless disregard of whether it was false or not,' " *id.* at 263, 279, 516 *A.*2d 1083 (quoting *N.Y. Times, supra,* 376 *U.S.* at 280, 84 *S.Ct.* at 726, 11 *L.Ed.*2d at 706).

Nine years later, in *Turf Lawnmower Repair, Inc. v. Bergen Record Corp., supra,* another defamation case against media defendants, we further defined the scope of "activities that affect the *public interest,*" which, when reported on in an investigative news article, will receive the heightened protection of the actual-malice standard. 139 *N.J.* at 410, 655 *A.*2d 417. In that case, the defendant newspaper published an article detailing widespread consumer fraud in the operation of the plaintiff's lawnmower repair business. *Id.* at 396–99, 655 *A.*2d 417. We distilled from our holdings in *Dairy Stores* and *Sisler* that business activities that affect health and safety and industries that are highly regulated by the government "intrinsically implicate[ ] important public interests," and therefore media reports on those subjects must be shielded by the actual-malice standard. *Id.* at 410–12, 417, 655 *A.*2d 417. We also determined that the public has a compelling "interest in any business charged with criminal fraud, a substantial regulatory violation, or consumer fraud that raises a matter of legitimate public concern." *Id.* at 413, 655 *A.*2d 417. On that basis, we concluded that "[w]hen the media addresses those issues," the actual-malice standard will apply, regardless of whether the business is heavily regulated by the government. *Ibid.*

We observed that the services provided by the lawnmower repair business in *Turf Lawnmower,* like those provided by shoe repair shops, dry cleaning stores, and many other small businesses, did "not intrinsically involve a legitimate public interest."

*Id.* at 412, 655 *A.2d* 417. Although we found that "the sale and repair of lawn mowers is a business that normally would trigger the negligence standard," *id.* at 413, 655 *A.2d* 417, we determined that the acts alleged in the newspaper article constituted consumer fraud in violation of the New Jersey Consumer Fraud Act, *N.J.S.A.* 56:8–1 to–184, thus implicating a matter of public interest that called for the application of the actual-malice standard, *Turf Lawnmower, supra,* 139 *N.J.* at 413–23, 655 *A.2d* 417.

Importantly, when we crafted the rule in *Turf Lawnmower,* we only spoke of its applicability to reports by the media. We remarked that "the public benefits from having the press act as a consumer affairs watchdog" and that a heightened standard of liability would "protect the public interest *and the press.*" *Id.* at 427, 655 *A.2d* 417 (emphasis added). We concluded by stating that "the vital role that *investigative reporting* plays in conveying that information to consumers justifies the imposition of the actual-malice standard to disclosures *by the press* that substantially concern allegations of consumer fraud." *Id.* at 428, 655 *A.2d* 417 (emphasis added).

Although speech involving matters of public concern or interest will call for the protection of the actual-malice standard, in *Dairy Stores, Sisler,* and *Turf Lawnmower,* we identified those matters only in the context of published investigative reports by media and media-related defendants. Here, we must distinguish between the kinds of speech that do and do not involve matters of public interest or concern in a non-media case.[15] How we decide that

---

[15] It bears mentioning that in *Rocci v. Ecole Secondaire MacDonald–Cartier,* 323 *N.J.Super.* 18, 731 *A.2d* 1205 (App.Div.1999), *aff'd as modified,* 165 *N.J.* 149, 755 *A.2d* 583 (2000), a non-media case, the Appellate Division affirmed the use of the negligence standard for liability in a defamation action brought by the plaintiff, a school teacher, who contended that her reputation was damaged by a letter forwarded to her principal by the defendant, a teacher at another school. *Rocci v. Ecole Secondaire Macdonald–Cartier,* 165 *N.J.* 149, 152–54, 755 *A.2d* 583 (2000); *Rocci, supra,* 323 *N.J.Super.* at 21–23, 731 *A.2d* 1205. The defendant's letter alleged that the plaintiff drank excessively and acted unprofessionally during a class trip to Europe. *Rocci, supra,* 323 *N.J.Super.* at 21–22, 731 *A.2d*

issue will determine where the delicate balance between reputation and free speech must be struck in this case.

## IV.

### A.

In defining what constitutes speech involving a matter of public interest or concern, we have relied on the common law, informed by the freedom of speech and press guarantees of Article I, Paragraph 6 of the New Jersey Constitution. *See, e.g., Sisler, supra,* 104 *N.J.* at 271–72, 279, 516 *A.*2d 1083. But as we have seen, " '[t]he right of a person to be secure in his reputation,' " which finds its source in Article I, Paragraph 1 of our State Constitution, has an equal claim in the development of defamation law in this state. *Neafie, supra,* 75 *N.J.L.* at 567, 68 *A.* 146, *quoted in Doe, supra,* 142 *N.J.* at 104–05, 662 *A.*2d 367. It is true that the law of defamation has undergone dramatic changes to adjust to modern times—strict liability is now gone, fault must be proven, and the falsity of a defamatory statement is no longer presumed. *See Singer v. Beach Trading Co.,* 379 *N.J.Super.* 63, 80, 876 *A.*2d 885 (App.Div.2005) (defining elements of defamation).[16] Nevertheless, reputation is still valued as essential to

---

1205. Relying on *Sisler,* the appellate panel found that the plaintiff teacher could not have reasonably expected that a class trip " 'implicate[d] a legitimate public interest with an attendant risk of publicity' " and therefore the defendants were to be judged by the negligence standard, not the actual-malice standard. *Id.* at 22, 731 *A.*2d 1205 (quoting *Sisler, supra,* 104 *N.J.* at 279, 516 *A.*2d 1083). On appeal to our Court was only one issue—whether damages could ever be presumed in a defamation case. *Rocci, supra,* 165 *N.J.* at 152, 155, 755 *A.*2d 583. We held that when speech "touch[es] on a matter of public concern," damages cannot be presumed without a finding of actual malice. *Id.* at 156, 755 *A.*2d 583. Although we determined that "the content of defendant's letter implicated the public interest," *id.* at 160, 755 *A.*2d 583, we did not address whether the applicable standard of care for determining liability was negligence or actual malice.

16 In New Jersey, proof of fault—negligence or actual malice—is now always required in a defamation case. *See Costello, supra,* 136 *N.J.* at 612, 643 *A.*2d

human dignity and worth. It is not a historical relic but remains important to the unique identity of every individual in our contemporary world.

In judging how to apply the common law to new circumstances, generally, we consider principles of fairness and public policy and the social realities of the day. *See Acuna v. Turkish,* 192 *N.J.* 399, 413–14, 930 *A.2d* 416 (2007) (identifying relevant considerations when modifying common law). The degree of protection that we give to speech depends on several factors: the public interest in the free and uninhibited flow of information, the speaker's ability to exercise due care, and the individual's need for legal recourse if his good name is subject to false and defamatory verbal attacks. Speech that does not involve matters of public concern requires that greater weight be placed on an individual's interest in an unimpaired reputation. In such circumstances, negligence is the appropriate standard of care. Ensuring the opportunity for just compensation for an individual harmed by a defamatory falsehood is no less important than ensuring the right of an accident victim to be made financially whole.

On the other hand, speech involving matters of public interest and concern needs adequate breathing room in a democratic society. *See N.Y. Times, supra,* 376 *U.S.* at 271–72, 84 *S.Ct.* at 721, 11 *L.Ed.*2d at 701; *Lynch, supra,* 161 *N.J.* at 166, 735 *A.*2d 1129. The significant societal benefit in robust and unrestrained debate on matters of public interest demands that we not impose a regime in which speakers will engage in self-censorship for fear of a ruinous defamation lawsuit. *See N.Y. Times, supra,* 376 *U.S.* at 278–79, 84 *S.Ct.* at 725, 11 *L.Ed.*2d at 705–06. Even the fear of having to defend against a defamation suit may make some too

---

1012. In a case involving the actual-malice standard, the plaintiff is required to establish fault by clear and convincing evidence. *See id.* at 614, 643 *A.2d* 1012. In a case involving the negligence standard, proof of fault must be established only by a preponderance of the evidence. *Kass v. Great Coastal Express, Inc.,* 291 *N.J.Super.* 10, 18, 676 *A.2d* 1099 (App.Div.1996), *aff'd in part, rev'd in part on other grounds,* 152 *N.J.* 353, 704 *A.2d* 1293 (1998).

timid to venture into discussions where speech may be prone to error. *See ibid.* In those circumstances, actual malice is the proper standard.

With the above factors in mind, a useful formula for determining what constitutes a matter of public concern or interest is found in *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 *U.S.* 749, 105 *S.Ct.* 2939, 86 *L.Ed.*2d 593 (1985). In that case, a business filed a defamation action against a credit reporting agency that had "grossly misrepresented [the business's] assets and liabilities," compromising its ability to obtain financing from a bank. *Id.* at 751, 105 *S.Ct.* at 2941, 86 *L.Ed.*2d at 597 (opinion of Powell, J.). Relying on the First Amendment, Justice Powell explained that when speech touches on matters of public concern, presumed and punitive damages are not available against the speaker in a defamation suit, "absent a showing of 'actual malice.'" *Id.* at 756–57, 105 *S.Ct.* at 2943–44, 86 *L.Ed.*2d at 600–01. In contrast, the role of the First Amendment in regulating state defamation law is more limited when "speech [touches] on matters of purely private concern." *Id.* at 759, 105 *S.Ct.* at 2944–45, 86 *L.Ed.*2d at 603. In particular, commercial speech "occupies a 'subordinate position in the scale of First Amendment values.'"[17] *Id.* at 758 n. 5, 105 *S.Ct.* at 2944 n. 5, 86 *L.Ed.*2d at 602 n. 5 (quoting *Ohralik v. Ohio State Bar Ass'n,* 436 *U.S.* 447, 456, 98 *S.Ct.* 1912, 1918, 56 *L.Ed.*2d 444, 453 (1978)).

Whether the false credit report in *Dun & Bradstreet* addressed "a matter of public concern" required a review of the report's "'content, form, and context ... as revealed by the whole record.'" *Id.* at 761, 105 *S.Ct.* at 2946, 86 *L.Ed.*2d at 604 (alteration in original) (quoting *Connick v. Myers,* 461 *U.S.* 138, 147–48, 103 *S.Ct.* 1684, 1690, 75 *L.Ed.*2d 708, 720 (1983)). As part of content,

---

[17] Under federal law, commercial speech is any "expression related solely to the economic interests of the speaker and its audience." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 *U.S.* 557, 561, 100 *S.Ct.* 2343, 2349, 65 *L.Ed.*2d 341, 348 (1980).

form, and context, the Court considered the identity of the speaker and the targeted audience. *See id.* at 761–63, 105 *S.Ct.* at 2947, 86 *L.Ed.*2d at 604–05. Because the "speech" contained within the credit report was "solely in the individual interest of the speaker and its specific business audience," the Court reasoned that it "warrant[ed] no special protection when—as in this case—the speech is wholly false and clearly damaging to the victim's business reputation." *Id.* at 762, 105 *S.Ct.* at 2947, 86 *L.Ed.*2d at 604. The Court concluded that credit reporting does not "require[ ] special protection to ensure that 'debate on public issues [will] be uninhibited, robust, and wide-open.'" *Ibid.* (second alteration in original) (quoting *N.Y. Times, supra,* 376 *U.S.* at 270, 84 *S.Ct.* at 721, 11 *L.Ed.*2d at 701).

The "content, form, and context" formula, infused by the factors discussed earlier, allows for clear distinctions between speech worthy of the heightened protection of the actual-malice standard, and speech of a subordinate kind meriting the negligence standard. For example, the actual-malice standard applies to speech critical of the government and to discourse on political subjects, which are at the core of First Amendment values, whereas the negligence standard is more appropriate for commercial speech, which is likely to advance the specific business interests of the individual speaker. *Compare Buckley v. Valeo,* 424 *U.S.* 1, 14, 96 *S.Ct.* 612, 632, 46 *L.Ed.*2d 659, 685 (1976) (discussing political speech), *and State v. Miller,* 83 *N.J.* 402, 411–12, 416 *A.*2d 821 (1980) (same), *with Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.,* 447 *U.S.* 557, 562 n. 5, 100 *S.Ct.* 2343, 2349 n. 5, 65 *L.Ed.*2d 341, 348 n. 5 (1980) (discussing commercial speech), and *Twp. of Pennsauken v. Schad,* 160 *N.J.* 156, 175, 733 *A.*2d 1159 (1999) (same).

There is significant authority, both federal and state, indicating that when considering the degree of protection to be given to speech, one factor must be the identity of the speaker. To illustrate the point, the United States Supreme Court has, on occasion, expressly limited its holdings in defamation law cases to

media defendants. *See, e.g., Phila. Newspapers, Inc. v. Hepps,* 475 *U.S.* 767, 768–69, 106 *S.Ct.* 1558, 1559, 89 *L.Ed.*2d 783, 787 (1986) (holding that under First Amendment, when private-figure plaintiff files defamation suit against newspaper, which "publishe[d] speech of public concern," plaintiff must prove that challenged statements are false); *see also Rowe v. Metz,* 195 *Colo.* 424, 579 *P.*2d 83, 84–85 (1978) (interpreting rule of *Gertz* to apply only in cases with media defendants); *Kanaga v. Gannett Co.,* 687 *A.*2d 173, 181–82 (Del.1996) (same); *Wheeler v. Green,* 286 *Or.* 99, 593 *P.*2d 777, 784 (1979) (same); *Denny v. Mertz,* 106 *Wis.*2d 636, 318 *N.W.*2d 141, 153 (same), *cert. denied,* 459 *U.S.* 883, 103 *S.Ct.* 179, 74 *L.Ed.*2d 147 (1982). We, at least implicitly, limited our holding in *Turf Lawnmower, supra,* to media defendants. *See* 139 *N.J.* at 427, 655 *A.*2d 417.

 Indeed, New Jersey provides certain free speech protections only to the press. The newsperson's privilege under this state's Shield Law, *N.J.S.A.* 2A:84A–21; *N.J.R.E.* 508(a), confers only to members of the news media the right to refuse to disclose their sources. Our Shield Law "provid[es] the 'strongest possible protection' to the newsgathering and news reporting activities *of the media.*" *In re Venezia,* 191 *N.J.* 259, 269, 922 *A.*2d 1263 (2007) (emphasis added) (quoting *In re Subpoena Issued to Schuman,* 114 *N.J.* 14, 20, 552 *A.*2d 602 (1989)). We have held that in the context of a defamation lawsuit, "the ·newsperson's privilege ... is absolute." *Maressa v. N.J. Monthly,* 89 *N.J.* 176, 182, 445 *A.*2d 376, *cert. denied,* 459 *U.S.* 907, 103 *S.Ct.* 211, 74 *L.Ed.*2d 169 (1982).

It is also worth noting that a number of states have distinguished between media and non-media defendants in crafting their own defamation laws. *See, e.g., Vinson v. Linn–Mar Cmty. Sch. Dist.,* 360 *N.W.*2d 108, 118 (Iowa 1984) (explaining that applying lower standard of fault in defamation cases with non-media defendants "does not threaten the free and robust debate of public issues or a meaningful dialogue about self-government"); *Jadwin v. Minneapolis Star & Tribune Co.,* 367 *N.W.*2d 476, 487–88

(Minn.1985) (noting that applying actual-malice standard in cases involving media defendants "will encourage the media to probe the business world to the depth which is necessary to permit the kind of business reporting vital to an informed public").[18]

Logic suggests that in determining whether speech involves a matter of public interest, the source of the speech should be one of the factors considered. A media defendant is unlikely, for the most part, to derive a direct economic benefit from harming the reputation of a person who is the subject of a story. That is a critical reason why, under our common law, it is sensible to give the media enhanced protections when it publishes information on subjects related to health and safety, highly regulated industries, and consumer fraud. *See Turf Lawnmower, supra,* 139 *N.J.* at 427, 655 *A.*2d 417. Thus, the content, form, and context of the speech, including the disinterested nature of the speaker, indicate that news stories about those subjects involve the public interest and deserve heightened protection.[19]

Conversely, when a business owner maligns his competitor in the marketplace for apparent economic gain, it is difficult to reach

---

[18] Interestingly, Colorado and Indiana—two of the handful of states that, like New Jersey, have imposed the actual-malice standard for speech about a private individual that touches on a matter of public concern—did so on the basis of the need to protect the news media from defamation lawsuits. *See Walker v. Colo. Springs Sun, Inc.,* 188 *Colo.* 86, 538 *P.*2d 450, 458 ("Our ruling here results simply from our conclusion that a simple negligence rule would cast such a chilling effect upon the news media that it would print insufficient facts in order to protect itself against libel actions; and that this insufficiency would be more harmful to the public interest than the possibility of lack of adequate compensation to a defamation-injured private individual."), *cert. denied,* 423 *U.S.* 1025, 96 *S.Ct.* 469, 46 *L.Ed.*2d 399 (1975); *Journal–Gazette Co. v. Bandido's, Inc.,* 712 *N.E.*2d 446, 453 (Ind.) ("A negligence standard in matters of public or general concern for private individuals likely would require the news media to censor stories of public or general concern or avoid publication of controversial articles."), *cert. denied,* 528 *U.S.* 1005, 120 *S.Ct.* 499, 145 *L.Ed.*2d 385 (1999).

[19] As we have observed, however, "not everything that is newsworthy is a matter of legitimate public concern." *Dairy Stores, supra,* 104 *N.J.* at 144, 516 *A.*2d 220.

the conclusion that such commercially disparaging expressions are at the heart of free speech values or implicate any of the concerns that animated the *New York Times* decision. There seems to be no sound reason why, under our common law, a business should not be expected to exercise due care in speech that may affect the economic well-being of a competitor.

[14] It is sensible to insulate some careless speech aimed at the greater good of disseminating knowledge on matters of public interest. But it is not justifiable to protect negligent speech that produces falsehoods and harm to others without any real compensating benefit. We cannot find any significant public benefit in giving business rivals greater protection for the false and defamatory speech they use as an economic club to harm each other. Clearly, information that is of benefit to the public can arise in most any circumstance, such as when an economic competitor discloses damaging details about another's business. However, in weighing reputational interests and free speech rights in that scenario, the negligence standard sets the right balance and provides sufficient protection to the speaker and the target of his speech. It bears mentioning that even under the negligence standard in a defamation action, no business owner will ever be liable for the truth he tells about a rival. *See Ward v. Zelikovsky,* 136 *N.J.* 516, 530, 643 *A.2d* 972 (1994) ("True statements are absolutely protected under the First Amendment.").

## B.

We now summarize the rules governing whether to apply the actual-malice standard for liability purposes in defamation cases. The actual-malice standard will apply when the alleged defamatory statement concerns a public figure or a public official or involves a matter of public concern. *See Curtis Publ'g, supra,* 388 *U.S.* at 163–65, 87 *S.Ct.* at 1996, 18 *L.Ed.2d* at 1116–17 (Warren, C.J., concurring); *N.Y. Times, supra,* 376 *U.S.* at 279–80, 84 *S.Ct.* at 726, 11 *L.Ed.2d* at 706; *Turf Lawnmower, supra,* 139 *N.J.* at 413, 655 *A.2d* 417. When published by a media or

media-related defendant, a news story concerning public health and safety, a highly regulated industry, or allegations of criminal or consumer fraud or a substantial regulatory violation will, by definition, involve a matter of public interest or concern. *See Turf Lawnmower, supra,* 139 *N.J.* at 410, 413, 655 *A.*2d 417. In all other media and non-media cases, to determine whether speech involves a matter of public concern or interest that will trigger the actual-malice standard, a court should consider the content, form, and context of the speech. *See Dun & Bradstreet, supra,* 472 *U.S.* at 761–62, 105 *S.Ct.* at 2946–47, 86 *L.Ed.*2d at 604 (opinion of Powell, J.). Content requires that we look at the nature and importance of the speech. For instance, does the speech in question promote self-government or advance the public's vital interests, or does it predominantly relate to the economic interests of the speaker? Context requires that we look at the identity of the speaker, his ability to exercise due care, and the identity of the targeted audience.

This much we can say for certain. Discourse on political subjects and critiques of the government will always fall within the category of protected speech that implicates the actual-malice standard. Public policy and common sense also suggest that the same protections be given to speech concerning significant risks to public health and safety. *See Dairy Stores, supra,* 104 *N.J.* at 144–45, 516 *A.*2d 220. On the other hand, there is no great societal benefit or higher free speech value in providing heightened protection for the defamatory and false statements uttered by one business competitor against another. That form of commercial speech, generally, will call for the application of the negligence standard.[20]

We now apply those rules to this case.

---

[20] For our purposes, we define commercial speech as expression that predominantly relates to the economic interests of the speaker. *Cf. Cent. Hudson, supra,* 447 *U.S.* at 561, 100 *S.Ct.* at 2349, 65 *L.Ed.*2d at 348.

## V.

In this case, defendant Florimont, in a face-to-face conversation, told his Fascination parlor competitor, plaintiff Senna, that Wildwood was his town and that he intended "to run [plaintiff] out of business." When plaintiff moved his Seaside Heights parlor to Wildwood, he placed an advertisement in a local newspaper promising to honor prize tickets at his new location, and according to plaintiff, he did so. Nevertheless, during the summer months of 2003, the employees of defendants Florimont and 2400 Amusements broadcast over a public address system to boardwalk customers that plaintiff was "dishonest" and "a crook," and that he " 'screwed all of his customers in Seaside.' " They accused plaintiff of cheating his customers, leaving them with worthless prize tickets—tickets that plaintiff would not redeem, even though they were won at one of plaintiff's previous Fascination parlors. Because this matter comes to us on defendants' motion for summary judgment, we accept as true, for purposes of this appeal, that the statements at issue were false and defamatory.

Defendants claim that even if their employees' accusations of consumer fraud were false, defamatory, and negligently made, they should not be held liable because plaintiff cannot meet the actual-malice standard. We reject the argument that the actual-malice standard applies in this case.

First, defendants have not suggested that, for First Amendment purposes, plaintiff is a public official or a public figure who has achieved "pervasive fame or notoriety" or "voluntarily inject[ed] himself ... into a particular public controversy." *Gertz, supra*, 418 *U.S.* at 351, 94 *S.Ct.* at 3012–13, 41 *L.Ed.*2d at 812. Moreover, we cannot conclude that, under our state's common law, the speech involved matters of public concern or interest. The content of the broadcasts by defendants' employees can fairly be characterized as commercial speech. The form and context of those broadcasts leave little doubt that the accusations of consumer fraud were intended to drive business away from plaintiff's Fascination parlor and into defendants' establishment.

Here, the identity of the speaker is an important factor. Defendants would have us conclude that whenever one business tars its competitor with the canard of consumer fraud, the accusation, even if false, involves a matter of public concern. However, this was not a case of disinterested investigative reporting by a newspaper, using a variety of sources, to demonstrate that customers were being defrauded by a service-oriented business, as was true in *Turf Lawnmower, supra.* *Cf.* 139 *N.J.* at 396–400, 655 *A.*2d 417. Defendants' employees were basically scaring customers away from plaintiff.[21] Their accusations were not more highly valued speech because they charged their rival with consumer fraud rather than a peccadillo. It cannot be that, in the competition of the marketplace, the bigger the lie the more free speech protection for the publisher of the lie. Businesses have an obligation to act with due care before calling the services rendered by a rival crooked or fraudulent.

Defendants also claim that Fascination parlors are highly regulated businesses and therefore their employees' false and disparaging broadcasts about their competitor do not render them liable, even if they were negligent, because they fall within the safe harbor of the actual-malice standard. Defendants unmoor the term "highly regulated industry" from its conceptual settings in *Sisler* and *Turf Lawnmower.* *See id.* at 410, 655 *A.*2d 417 (citing *Sisler, supra,* 104 *N.J.* at 279, 516 *A.*2d 1083). There is a difference between a newspaper publishing an investigative report about the questionable loan practices of a bank, which is part of a highly regulated industry, and a highly regulated Fascination parlor using its public address system in an attempt to put out of business its competitor's highly regulated Fascination parlor. *Cf. Sisler, supra,* 104 *N.J.* at 259–61, 516 *A.*2d 1083.

---

[21] It is worth noting that the casino industry, which is highly regulated, does not place a high premium on speech uttered by a barker. Indeed, *N.J.S.A.* 5:12–100(1) bars a casino from using a barker "for any purpose whatsoever."

The invocation of the term "highly regulated industry" is not talismanic, giving every speaker immunity for his negligent, false, and harmful speech. In New Jersey, not just banks and arcade games, but professions (e.g., law, medicine, and accountancy), trades, and many other businesses are highly regulated by the government. The critical inquiry in determining whether speech involves a matter of public interest is the content, form, and context of the speech. For example, when one accountant wrongly and falsely accuses another accountant of overcharging clients, and disseminates those accusations to clients, the public interest is not served by shielding the speaker from the consequences of his negligence. The same holds true for Fascination parlors.

So long as one business tells the truth about another, or does not publish a falsehood negligently, that business will not be exposed to liability. *See Costello, supra,* 136 *N.J.* at 612, 643 *A.*2d 1012; *Ward, supra,* 136 *N.J.* at 530, 643 *A.*2d 972. The speech in this case no more involves the public interest than the false credit report in *Dun & Bradstreet, supra. Cf.* 472 *U.S.* at 751–52, 761–63, 105 *S.Ct.* at 2941, 2946–47, 86 *L.Ed.*2d at 597–98, 604–05 (opinion of Powell, J.). In balancing the respective interests at stake here, including plaintiff's right to enjoy his reputation free of unfair and false aspersions, the negligence standard adequately protects defendants' free speech rights.

## VI.

*New York Times* and the present case represent the antipodes of the free speech spectrum. The actual-malice standard was born of the need to give adequate play for speech on important issues confronting our nation, our state, and our communities. Our state common law has expanded the protections articulated in *New York Times* and its federal progeny, ensuring heightened protections for speech that involves matters of public concern or interest. However, none of our state law precedents—not *Dairy Stores, Sisler,* or *Turf Lawnmower*—presaged extending the actual-malice standard to the type of commercial speech illustrated in

this case—boardwalk barkers persuading patrons of Fascination games to stay away from a competitor's parlor. Based on the content, form, and context of the challenged speech, including the identity of the speaker and intended audience, we conclude that the speech involved here did not touch on matters of public concern or interest, and therefore the trial court should have applied the negligence standard as the appropriate standard of care.

Because the Appellate Division affirmed the trial court's use of the actual-malice standard in granting summary judgment in favor of defendants, we reverse and remand for proceedings consistent with this opinion.[22]

*For reversal and remandment*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS—7.

*Opposed*—None.

---

[22] Although plaintiff alleges that employees of defendants, not defendant Florimont himself, made the allegedly defamatory statements, the doctrine of respondeat superior permits vicarious liability in negligent defamation claims. *See Printing Mart–Morristown v. Sharp Elecs. Corp.*, 116 *N.J.* 739, 771, 563 *A.2d* 31 (1989). We take no position, however, on whether plaintiff's claims should survive summary judgment under the negligence standard.